## Ex Parte MORGAN SMITH.

1. The Supreme Court has a discretionary power to grant writs of prohibition to all the inferior courts of the State ; but the writ should never be granted, except in cases where the inferior court has clearly exceeded its jurisdiction in the order complained of, and the relator has no other remedy to which he can resort for his protection.

2. An interlocutory order of the Chancellor, directing " *that a receiver be appointed* to take possession" of the defendant's estate, " and that he and either of the parties have leave to apply to the court for any other or further directions, as to him may be necessary ; *and that it be referred to the register, to appoint a fit and proper person to be the receiver aforesaid,* the person so to be appointed first giving bond," &c., and directing the defendant to deliver up to him his plantation, &c., is a nullity, and the writ of prohibition should go from the Supreme Court to revoke it, and prevent proceedings under it. (*Per* Justices LIGON, GOLDTHWAITE and PHELAN.)

(CHILTON, C. J. and GIBBONS, J., *dissenting*, held that the order was only, at most, an erroneous construction of the statute ; that the relator should have first applied to the Chancellor, by petition, for a correction or modification of the order ; and that, as the Chancellor had jurisdiction of the case made by the bill, and a discretion as to the appointment of a receiver, and had erred merely in the manner of making the appointment, the writ should not be granted.)

THIS was an application for a writ of prohibition, or any other remedial process within the jurisdiction of this court to grant, for the purpose of arresting certain proceedings had upon the order of the Hon. J. W. Lesesne, Chancellor, in vacation, upon a bill filed by Sarah O. Smith against her husband Morgan Smith, the relator, in the matter of appointing a receiver.

The bill, among many charges which it is unnecessary for the purposes of this investigation to notice, substantially alleges that the complainant was married to the said Morgan Smith in the year 1824 ; that, in 1846, he committed adultery, with one

of his own negro women, called Ides ; that having detected him in the act, he threatened complainant with personal violence, and pursued her out of the room until she sought refuge in the protection of her son ; that she left his house at that time, which was the 25th day of October, 1846, and did not return until December of that year, he promising to reform his habits of intoxication, which she believed to be the cause of his infidelity and other bad conduct, and she agreeing, upon such reformation, to forgive the past and to be reconciled to him ; but they occupied separate chambers, and lived without conjugal intercourse. The bill then sets out further efforts to reclaim her husband, all which proved abortive, until, by his repeated acts of unkindness and harsh treatment, and on one occasion of actual violence, in June, 1848, she was compelled to separate from him, since which time they have had no intercourse as man and wife.

That laboring under fears of personal violence, occasioned by his conduct and threats which he repeatedly made, the complainant in March, 1852, caused a bill to be prepared for a divorce from the bonds of matrimony, and for alimony, against her said husband ; but, to avoid making public her domestic troubles, it was deemed best to advise her husband of her claim for a separate maintenance, and of her intended application by bill, which was accordingly done, and on the 29th March, 1852, he agreed to settle on a trustee, for the sole and separate use of the complainant, one half of all his real and personal estate ; and on that day he executed a deed for that purpose, which is made an exhibit to the bill, by which said Morgan grants and conveys to Frank J. Smith, one half of all his real and personal estate of every description, to have , hold, &c. for the sole and separate use of complainant and her heirs forever.

In said instrument it is provided, that, as soon as convenient, and at all events by the first day of January then next, a division of the estate of said Morgan should be made in quantity and value, so as to separate the portion thereby granted to the trustee ; and said Morgan bound himself, that, on said division, he would execute a deed to the trustee for the part assigned him, on the same trusts specified in this deed ; also, that on said division, the slaves formerly belonging to the wife should be included in her part, if practicable. The deed then prescribes the

manner, and designates the persons who are to make the division, appointing three individuals to make it, any two of whom may act.

One of the persons so appointed having departed this life, the other two, with suitable assistance, went to the house of said Smith on the 28th December, 1852, and divided the slaves and the land; but the other personal property remaining undivided, it was suggested, that it would be better to postpone the division of that until the close of the year, when a division of that also should be made, and thereupon it was consented that, instead of working their hands on their separate tracts, they should continue to work them in common on both tracts, and make a crop for the year 1853, employing also the undivided personal property.

At the time of this division, the said Morgan Smith executed a deed for the land, embracing some eighteen hundred acres, and between seventy and eighty slaves, being the shares allotted to his wife, conveying the same to Frank J. Smith in trust for the sole and separate use of Mrs. Smith, and providing, as the consideration of the deed, that the same should be in lieu of dower and all interest in his estate on the part of Mrs. Smith, and that he should not be made chargeable with any debts contracted by her. This deed bears date the 29th December, 1852, and is made an exhibit to the bill.

Cotemporaneous with the execution of the above deed, another instrument was entered into between said Morgan Smith and the trustee, whereby, after reciting the two deeds above named, it is provided and agreed " to postpone the division of the other personalty until the 1st day of December, 1853, or as soon thereafter as practicable," and to employ the slaves, horses, mules, stock, &c. &c. owned by the parties severally, as well as the property undivided, upon the land owned by them in common, and to make a crop for the year 1853, and to divide equally the proceeds of the crop so raised.

Afterwards, on the 17th day of June, 1853, said Sarah O. Smith executed to her husband what purports to be a relinquishment of her dower and a release of all claim to any portion of his estate, in consideration of the provision made for her by the deeds aforesaid, executed by her husband. All which deeds and agreements form exhibits to the bill.

The bill charges, that the dwelling house, negro cabins, &c. fell to her in the division of the land ; that her object was, in preparing her first bill, to obtain the means of living apart from her said husband, free from the annoyance of his abuse and presence, brutalized, as she charges him to be, with intemperance, and believing that she had secured to her a home where she might so live, and that the same was her separate property, she went in January, 1853, to the dwelling house and took up her residence there. On the morning of her arrival, her husband not being present, she took possession of the keys. He came in the night of that day; took from her the keys, and on her protesting against his interference, as it was her house, and her saying there should be no liquor kept there, he pulled her nose, spit in her face, and went towards the place where the guns were kept, swearing he would kill, &c.

The bill abounds with such charges of abuse and threats, and of the defendant's drunkenness, and substantially avers that he is mismanaging the farm and negroes, committing waste in cutting the timber from complainant's portion of the land, and causelessly turning off overseers who threaten to sue for their wages ; that she verily believes, in his phrenzy from drunkenness, he will, in order to annoy and distress her, causelessly punish and ill treat her negroes, and take the life and seriously injure some of them ; that serious loss and injury have occurred to the negroes from his giving them medicine when he was intoxicated ; that on this subject of administering medicines to the slaves he is a monomaniac, and no entreaty or persuasion can induce him to desist ; that by his cruel treatment to her, she has been driven from her own house, and she cannot, she believes, live there safely, except under the protection of the Chancellor ; that the trustee, not desiring to come in conflict with his father, refuses to maintain her sole possession of her house, and that she is without remedy except in the Chancery Court; that she proposed to him to work their separate hands on the lands belonging to each, and to employ separate overseers, and at the end of the year to divide the crop, according to their agreement, but he refused ; that he has not accounted for the past year's crop, or paid any portion of the same; that from his habits of intoxication, and state of mind produced thereby, the said defendant is incapable of superintending the management of the plantation

10

and negroes, or of selling and taking proper care of the proceeds of the crops, and she fears that great injury will be done to her interest, unless the court will interfere for her protection. She also charges, on information, that, at the date of the first deed, said Morgan Smith had about ten thousand dollars in money, and bonds and notes and other evidences of debt amounting to twenty-five hundred dollars, subject to division, but which he fails to account for.

The complainant prays an injunction against said Morgan, "enjoining him from entering the dwelling house of the complainant as described in the deed, or the yard of said dwelling, or from approaching near enough to the said house to speak to her while she is there, or from cursing or speaking to her in a harsh or abusive manner, or in abusive language, or from annoying, harrassing or disturbing her in any other manner, or trespassing upon her, until the further order of this court; and that he be enjoined from cutting down any of the timber on the land of the complainant in the bill described, or removing any of the timber cut down by him on said land, or any of the rails made of timber cut on said land, or from using any of the house logs and poles cut down by him, or which may have been hauled by him from her lands to his own tract, until the further order of the court; also, prays that a receiver be appointed, to take possession of the plantation and negroes, horses, mules, stock, provisions, and every thing necessary to carry on the planting operations, with directions to make the crops, and to dispose of the cotton, and with such further directions as may be necessary to protect the rights of the complainant, and that said Morgan Smith be enjoined from interfering in any wise with the receiver in the management or control of the same; also prays an account of the crop raised in 1852, and of the money and choses in action owned by Smith at the time of the first agreement, namely, the 29th March, 1852, and which is subject to division in virtue of said agreement, and that an account be taken of the value of the timber which said Morgan has cut down from the lands of complainant, all which, she prays, may be decreed to her trustee, Frank J. Smith, for her sole and separate use. The bill concludes with a prayer for a divorce *a mensa et thoro*, and for general relief, and makes the trustee, Frank J. Smith, and Morgan Smith, parties defendants.

The bill was sworn to by Mrs. Smith, and exhibited to the Chancellor (Lesesne) on the 21st June, 1853, who made a *fiat*, that, on complainant's next friend entering into bond, with approved security, in the sum of twenty thousand dollars, payable to the register of the Chancery Court, and conditioned to pay all damages which the defendant Morgan Smith might sustain by the suing out the injunctions prayed for, if the same should be dissolved, then that injunctions issue according to the prayer of the bill.

The bond required by the *fiat* was given, and the register issued an injunction accordingly, on the 24th June, 1853.

On the same day, the solicitors for the complainant caused a written notice to be served upon the defendant, Morgan Smith, informing him that on the next day (June the 25th) the complainant would move the Chancellor, then holding the Chancery Court in Montgomery, for the appointment of a receiver to take possession of the plantation and premises in the bill described, and then in possession of said defendant, and also of all the negroes, stock, &c. &c., employed upon said premises in carrying on the farming operations ; and that she would ask for directions to such receiver, as to making the crops and disposing of the cotton, and upon his appointment, for an injunction against Smith's interference in any way with his possession, management or control of the trust so delegated by the Chancellor.— This notice stated that the grounds of the application were to be found in the bill filed by the complainant, supported by affidavits.

On the day appointed, the parties appeared before the Chancellor, by their solicitors, and the cause was postponed until the 27th, when the Chancellor proceeded to the consideration of the motion.

The defendant desired further time in order to file his answer, that he might read it upon the hearing of the motion for a receiver, and made affidavit that his answer would amount to a denial on oath of all the equities of the bill. In order to avoid further delay, it was consented by the complainant that the answer of the defendant should be considered as filed and as read upon the trial, and that the Chancellor should regard it as denying all the equities of the bill. Thereupon, the complainant read a copy of her bill, as certified by the register of Lowndes

County, and submitted the affidavits of Frank. J. Smith, Joseph R. Morefield and John Christie. It appeared that these affidavits had been submitted to the solicitors for the defendant; but the defendant had no notice otherwise of the names of the persons whose affidavits would be used on the trial. The defendant's solicitors moved to reject the affidavits, upon the ground : 1st, that they could not properly be read on such an application, and 2nd, that the defendant should have been notified of the names of the persons whose affidavits would be relied upon, when he was informed of the motion. These objections were overruled by the Chancellor, and the affidavits were ordered to be filed as part of the record in the cause. Thereupon, the Chancellor ordered that " a receiver be appointed to take possession of the plantation, negroes, horses, mules, stock and provisions, mentioned in the bill and for which a receiver is therein prayed, and also to take charge of every thing on the plantation necessary to carry on the plantation operations, and that said receiver proceed to make and gather the crops, and dispose of the cotton when ready for market, and that he and either of the parties have leave to apply to the court for any other or further directions to him as may be necessary; and that it be referred to the register of the Chancery Court at Hayneville to appoint a fit and proper person to be the receiver aforesaid of said property and crops : the person so to be appointed first giving bond in the sum of twenty-five thousand dollars, to be approved by the register, duly to account for and pay over what moneys he may receive therefrom, and account for and deliver the property so received by him, according to the order and direction of the court." And it was ordered that the defendant, Morgan Smith, deliver to such receiver, when so appointed, the possession of said plantation and negroes, and other personalty above mentioned. To this order the defendant objected, and prayed an appeal to this court, which was allowed upon his giving security for the cost of this court within sixty days.

On the 28th day of June, it appears that E. H. Herbert, the register of the Chancery Court at Hayneville, in Lowndes County, in obedience to the order of the Chancellor, appointed Frank J. Smith, who, he says in the order of appointment, was proposed by the complainant's solicitors, and with whom he

was well acquainted, and he had upon inquiry of others also ascertained that he was a fit and proper person for said office, and the said receiver entered into the required bond with security, which bond was by him approved.

It is deemed needless to set out the affidavits; they fully sustain the principal allegations of the bill.

BELSER & RICE and N. HARRIS, for the relator:

1. No person shall be deprived of life, liberty or property without due process of law.—5 Amendment Const. U. S. § 10 Bill of Rights of Ala.

2. The Supreme Court of Alabama has power to issue any "remedial" or "original" writ, which may be necessary to give it a *general superintendence* and *control* of inferior jurisdictions. The phrase "inferior jurisdictions" here used, includes every chancellor, chancery court, circuit judge and circuit court in Alabama, as well as courts and magistrates whose powers are still more circumscribed.—Const. Art. 5 § 2.

3. There can be no doubt of the power of the Supreme Court to issue a writ of prohibition or *mandamus*, or any other remedial or original writ, to a Chancery Court or to a Chancellor.—Glasscock v. Johnston, 2 Ala. Rep. 519; The State *ex rel.* Att'y Gen. v. Porter, 1 Ala. Rep. 688.

4. It is not only the right of the Supreme Court to issue such writs, but its plain constitutional duty, wherever the issuance of such a writ becomes "necessary to give it a general superintendence and control" of any jurisdiction in the State "inferior" to the Supreme Court. Every exercise of lawless or unauthorized power by any inferior jurisdiction in this State, is subject to the "control" of the Supreme Court.

5. The new Code of Alabama, § 2986, declares, that "receivers can *only* be *appointed* by *the Chancellor.*"

It is well settled, that a judicial officer cannot delegate to another the power and authority by law entrusted to him.—Butler v. Foster, 14 Ala. Rep. 323; Rex v. Croke, 1 Cowper's R. 26; Perkins v. Reed, 14 Ala. Rep. 536.

The Chancellor does *not* in this case *appoint a receiver*, but orders that "a receiver be appointed," and "that it be referred to *the register* of said Chancery Court at Hayneville *to appoint* a fit and proper person to be the receiver aforesaid of the said

property and crops," &c. This order is made in vacation, in Montgomery County, on the 27th June, 1853 ; and "in vacation, June 28th, 1853," the said register at Hayneville, under color of said order, appointed Frank J. Smith the receiver! The said order of the Chancellor directed the register to take a bond with security, in the sum of $25000, duly to account &c. from the person who might be appointed receiver by said register, and a bond was taken by the register. The said order of the Chancellor was, that the said Morgan Smith (the relator) "deliver to such receiver, when so appointed, the possession of said" real and personal estate. The relator objected and excepted to each of the rulings of the Chancellor in the premises.

One half of the property consisting of lands, a plantation with a growing crop thereon, slaves and other personalty, is admitted by the bill itself to be the exclusive property of the relator, upon which the complainant has *no claim nor lien* whatever, either legal or equitable! The relator has no other lands or slaves, except such as are embraced by the bill and order that the receiver be appointed. Although a man of wealth, he is by this order of the Chancellor, and appointment of a receiver, deprived of *the control and possession of all his estate.*

Now, for the sake of argument, let it be conceded that the Chancellor *had jurisdiction of the case made by the bill.* The concession does not touch *one of the great points* involved in the present application. That point is, that the Chancellor had *no jurisdiction, no power, to delegate to the register the appointment of a receiver, nor* to order the relator to deliver to the receiver, " when so appointed," all his (the relator's) lands and slaves and other personalty.—3 Black. Com. 112–113 ; 8 Bacon's Abr: 230–228 ; Rowland v. Hockenhulle, 1 Ld. Raym. 698 ; Gould v. Gupper, 5 East's Rep. 365. However much of equity there may be in the bill—however undoubted may be the jurisdiction of the Chancellor over the case made by the bill, it is clear that his order, delegating to the register the appointment of the receiver, is utterly *void.*—14 Ala. Rep. 323, 536, *supra.*

Now shall that void order, and the proceedings had under color of it, stand until the final hearing of the bill ? Shall the receiver appointed under it, hold the property until some final order or decree is made, from which an appeal will lie ? Shall the relator be told, by the highest judicial tribunal in the State, " If the

order was valid, we *could not* interfere; but as it is void, we *will not ;* you must resist and disobey the order, and defy the Chancellor and the receiver, or you may bring your actions of trespass against all who take your property under the order. Is such the " *control* " over inferior jurisdictions, which the constitution has enjoined upon the Supreme Court?

The bond taken of the receiver is no security. It is void.— Jackson v. The Governor, 15 Ala. Rep. 703.

" Every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or *delay*."—§ 14, Bill of Rights of Ala.

The relator has been injured by the appointment of a receiver, as above shown. His legal rights have been taken from him. He is entitled to a " remedy," and " without delay." The remedy, of course, must be an adequate one. The question then is, what is the remedy? An appeal will not lie. Writs of error are abolished. The remedy must be a *certiorari*, a *mandamus* or prohibition. And we think a prohibition is the adequate and appropriate remedy, because, if in the proceedings of the Chancellor, he has done some unlawful acts and some lawful acts, this court in issuing the prohibition may lawfully distinguish between such lawful and unlawful acts, and prohibit only the unlawful acts.—8 Bacon's Abr. 218, 227. Or, if *part only* be without the jurisdiction of the Chancellor, this court may issue the prohibition as to all.—1 Ld. Raym. 798, and 8 Bacon's Abr., *supra;* 3 Dallas Rep. Whatever may be the proper writ, this court ought to issue. The relator applies for the proper writ, whatever it may be.

6. The Chancellor himself had no power, in this case, to appoint a receiver. This is not a case for a receiver.

The bill cannot be sustained as a bill for divorce *a mensa et thoro*, because the husband had, by voluntary agreement, permanently separated, and full provision had been made for her by her husband, which she had accepted. Regarding the bill as a bill for divorce *a mensa et thoro*, it would not authorize the Chancellor either to issue an injunction or appoint a receiver.— New Code, § 1970, 1980.

The bill is not authorized by sections 1994 or 1998 of the New Code, which two sections constitute the *only authority* in

Alabama (except the sections in divorce cases above cited) for a married woman to invoke the aid of chancery for the protection of her *separate estate*, or for protection of herself out of the hus-. band's estate against his improvidence or intemperance.

7. This is not even a case for an injunction. If every thing stated in the bill be true, there is a plain, adequate and complete remedy at law for every grievance therein alleged. The trustee's name could be used in suits at law, even if he were opposed to its use.—Roden v. Murphy, 10 Ala. R. ; State v. Mitchell, 2 Bailey's Rep. 228; Lehman v. Logan, 7 Ire. Eq. Rep. 296 ; Howell v. Howell, 5 Ire. Eq. Rep. 258.

The bill in this case is an effort to transfer to the Chancery Court matters of exclusive legal cognizance.—Montg. & W. P. R. R. Co. v. Walton, 14 Ala. Rep.; Howell v. Howell, 5 Iredell's Equity Rep. 258.

JOHN A. ELMORE and THOS. H. WATTS, *contra :*

1. The bill has equity on three grounds, viz: 1. The adultery charged. 2. The cruel treatment.—Moyler v. Moyler, 11 Ala. 620 ; Hughes v. Hughes, 19 Ala. 307. 3. The waste of the joint property, that is, of the crops and of the property of which there was a joint control.

2. By the agreement of 28th December, 1852, Morgan Smith acquired an interest in and control over the property, real and personal, of his wife, jointly with the trustee, and he and his wife are tenants in common of the individual property and of the crops ; and his management of this property is not the subject of an action at law. If it were, the trustee has refused to do anything. But from the nature of this management, it is shown that the injury will be irreparable.

3. The appointment of a receiver was within the power of the Chancellor, and it was properly exercised.

The selection of the person to act as such was referred to the register. This is a usual and proper course.—1 Smith's Chancery Practice, 631, 635 ; 3 Daniel's Ch. Pr. p. 1976 ; Code of Ala. § 2986.

4. The nature of the writ of prohibition is to stop all proceedings in the cause.—8 Bacon's Ab. Title Prohibition, 206 ; 3 Blackstone's Com. 112-3.

5. In England, this power was never exercised, except in the

following cases : 1. When inferior courts of *limited* jurisdiction took cognizance of a matter not within their jurisdiction. 2. When, in the course of their proceedings on some matter arising incidentally, they exceeded their jurisdiction. 3. When such courts act contrary to the rules of evidence according to the common law, when these rules of evidence should prevail. 4. When they try a matter contrary to the course of the common law, which should have been tried by the common law. 5. When they misconstrue an act of parliament. And all these cases, we insist, fall in fact under the general head of an excess of jurisdiction.—Grant v. Gould, 2 H. Black. 101, 104 ; Gould v. Gapper, 5 East 345 ; Ld. Camden v. Home, 4 Term 382 ; Home v. Ld. Camden, 2 H. Black. 533 ; 3 Blackstone's Com. (see also note 29) 112, 113, 114 ; Bacon's Ab. 8 vol. 206 ; Burger v. Carter, 1 McMullan 418.

6. The propriety and even power to issue such writs, in any other cases than where the inferior courts exceed their jurisdiction, has been questioned and denied in the English courts in some cases.—Hill v. Good, Vaughan Rep. 304 : Harrison v. Burwell, Vaughan Rep. 206 ; Lord Camden v. Home, (Buller, J.,) 4 Term 398, 399. To the same effect are the opinions of Ashurst, J. and Grose, J. in the same case.—Home v. Lord Camden, 2 H. Black. 535-6-7 ; Gould v. Gapper, 5 East 365; Brymer v. Atkins, 1 H. Black. 164 ; Grant v. Gould, 2 H. Black. 101.

7. In other than cases where the record shows the excess of jurisdiction, the party complaining must have insisted on, or objected to, the matter the determination of which by the court is the matter of complaint.—Cases *supra.*

8. Mere irregularities in the proceedings of such inferior courts, according to their own law, do not warrant a prohibition, unless they interfere with some right or benefit given by the statute or common law.—Home v. Ld. Camden, 2 H. Black. 539.

9. From the character of the inferior courts where these questions arose, and from the cases and the reasoning of the court, it is plainly inferrable that such writs were not allowed to *inferior* courts of *limited* jurisdiction whose proceedings were according to the course of the general common law of the land.

10. It is not granted to a want of chancery, when the subject

matter is within its jurisdiction.—*Ex Parte* Cowen, 3 B. & Alderson, 123.

11. The current of authorities in the United States show that, when the subject matter is within the cognizance of the court, a prohibition will not be allowed.—Adams v. Hopkins, Dudly 107 ; *Ex Parte* Gordon, 2 Hill N. Y. 363 ; People v. Seward, 7 Wendell 518 ; Arnold v. Shields, 5 Dana 18 ; People v. Judges, &c., 20 Wendell 658 ; *Ex Parte* Blackburn, 5 Arkansas 21 ; *Ex Parte* Williams, 4 Arkansas 537 ; Leonard's Case, 3 Richardson 111 ; Clayton v. Heidleberg, 9 S. & Mar. 623 ; State v. Mahely, 2 Nott & McCord 410 ; Gray v. Court, &c., 3 McCord 175 ; State v. Whyte, 2 N. & McCord 174 ; McDonald v. Elps, 1 Nott & McCord 501 ; State v. Redjell, 2 Bailey 560.

12. What is meant by jurisdiction is, not that on the case made the court will not afford relief, but from the nature of the case as shown by the record, the court cannot undertake to decide whether the party shall have relief or not. This depends on the nature of the case itself, or of the proceeding.

13. The powers of the Supreme Court under the constitution to issue writs, have been defined to be for the purpose of giving to this court a general superintendence and control of inferior jurisdictions ; and this is said to be " when some court, or some judge of a court, invested with authority to act in the premises, has undertaken to decide upon the case of a party aggrieved, or without just cause has refused to entertain the same.—*Ex Parte* Simonton, 9 Porter 383.

CHILTON, C. J.—By the second section of the fifth article of the constitution of this State, it is declared that, " The Supreme Court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be coextensive with the State, under such restrictions and regulations, not repugnant to this constitution, as may from time to time be prescribed by law ; *Provided,* that the Supreme Court shall have power to issue writs of injunction, *mandamus, quo warranto, habeas corpus,* and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions."

It is insisted by the counsel who have argued in favor of the

application, that it is the duty of the court, under the above provision of the constitution, to interpose and arrest the further action of the Chancellor in reference to the property mentioned in the bill, and to restore to the defendant the possession and control thereof, which, they allege, have been illegally taken from him. They maintain that, under the facts, as shown by the record, the writ of prohibition lies; but that, if it does not, this court should send out some other writ, or even frame a new writ, so as to effect that object.

I entertain no doubt as to the power and authority of this court, in a proper case, to restrain by writ of prohibition the unauthorized action or proceedings of the inferior courts. The question in the present case is, whether the record accompanying the application presents such a state of facts as will justify the resort to such extraordinary process.

According to the course of the common law, the writ of prohibition lies, where a party is drawn *ad aliud examen* by a jurisdiction or manner of process disallowed by the laws of the land; or, where in handling matters clearly within their cognizance, the inferior courts transgress the bounds prescribed to them by the law.—3 Bl. Com. 112. If the inferior court rightfully has jurisdiction, and in its proceedings commits errors, this is not the remedy for their correction.—The People v. Seward, 7 Wend. 518; 8 Bacon's Abr., by Bouv., 210.

It seems, also, now to be well settled in England, although it was formerly questioned, that the awarding of a prohibition is a matter discretionary, that is, "from the circumstances of the case, the superior courts are at liberty to exercise a legal discretion herein, but not an arbitrary one, in refusing prohibitions where in such like cases they have been granted, or where by the laws and statutes of the realm they ought to be granted."— 8 Bacon's Abr., title Prohibition, B., and the authorities there cited. The same doctrine is well sustained by the American cases.—Gray v. Court of Magistrates and Freeholders, 3 McCord 175-77; The State v. John Hudnall *et al.*, 2 Nott & McCord 419-23; *Ex parte* Brandtacht, 2 Hill's N. Y. Rep. 367-9.

The case has been elaborately argued upon the merits, as presented by the bill, and it is strenuously contended, on the part of the relator, that the bill has no equity; that it prays a temporary divorce, and at the same time shows that the parties

are separated by mutual consent, the husband having made most ample provision for the wife; that the waste upon the land, the injury both past as well as that anticipated to the slaves, as also the threatened danger of personal violence to the complainant, are all matters for which the law provides an adequate remedy, and consequently that the Court of Chancery has no jurisdiction to afford relief.

It is perfectly clear that, upon this investigation, it would be improper to go into a critical examination of the equity contained in this bill. The only question before us is, do the facts charged present such a case as shows that the matter before the Chancellor was *coram non judice;* and as to this, we are not allowed to entertain a doubt.

The Chancellor has exclusive original jurisdiction over the subject of divorce. He has jurisdiction to take an account between the parties, as to the produce of their property worked in common in the year 1852. The trustee refusing to act, the *cestui que trust* has the right to come into a court of equity to have the trust carried out; to have the trust fund husbanded and protected ; to have a new trustee appointed; and if, by the agreement between the husband and the wife, or her trustee, the parties were to work their slaves and use their live stock, &c., upon their lands in common for the year 1853, and to divide the crop, the husband to be the active manager of the property, and the crop is planted and growing, so that the agreement cannot now be terminated and the hands separated, without irreparable loss, and the husband is injuring the property, and by his dissipation and drunkenness is wholly unfit to carry on the affairs of the plantation and take care of the property, I think the Chancellor has ample power to put an effectual check to his reckless career, by placing the whole of the property in the hands of a fit and proper person to manage it, so as to carry out the agreement between the parties. And here I would take occasion to say, that the fact that a moneyed compensation might be made by Morgan Smith for the injury occasioned to the slaves in their mismanagement, or for dosing them to death with medicines administered by him when intoxicated, as charged in the bill and shown by the affidavits, constitutes no objection to placing the property in the hands of a receiver. Nor is such interposition of the Chancellor, under the circumstances of this case, any in-

fringement either of the letter or spirit of that provision of the fundamental law which declares, that no person shall be deprived of life, liberty, or property, without due process of law. The bill clearly avers the danger to the lives of the slaves employed in the common service of plaintiff and defendant, from the maltreatment of the latter, and charges his utter incapacity, by reason of his dissipated habits, for managing them; and this averment is substantially sustained by the affidavits. Now, the complainant having a common interest with the defendant in the labor and services of the slaves for the time agreed upon, and being the owner of one-half of them, has the right, as we have said, to insist that the agreement shall be carried into effect; that the slaves shall be properly managed and humanely treated; and on failure of the defendant to do this, especially when his dereliction endangers the lives of the slaves, the law pretermits the idea of compensation by way of damages, and on principles of humanity and irreparable injury, arrests the threatened consequences, upon an application *quia timet*.

As to the admission of the affidavits, which were read in aid of the allegations of the bill, it is unnecessary that we say more than that the question thus presented is one which we cannot properly investigate upon this application. If they were improperly read, it would amount, at most, to an error, and cannot, as we have before shown, be revised in this way.

We are all agreed, that upon the case presented, it was clearly within the jurisdiction of the Chancellor, not only to grant the injunction, but to appoint a receiver.

But, although the Chancellor, as we all concede, might himself have properly appointed a receiver, the question arises, whether he exceeded his jurisdiction in the order which he made; and what is the consequence of this excess of jurisdiction, conceding it to be such, as relates to the granting of a prohibition? And upon this question, the court, after much consideration, has been unable to agree.

In defining the powers of the register, the Code (§ 622) declares, that "He has no power to grant injunctions, or to dissolve the same, or to appoint receivers;" and section 2986 declares that "Receivers can only be appointed by the Chancellor," &c.

In the order made in this case, the Chancellor directs that a

receiver be appointed; determines, upon the equities of the bill and the facts brought to view in the affidavits, that the property should be taken from the possession of Smith, and placed under the control of the court; and he directs his register to *"appoint"* a fit and proper person to act as receiver, and to receive and approve his bond, the penalty of which he prescribes, and then proceeds to designate the powers with which such appointee shall be clothed; and the defendant, Morgan Smith, is directed to deliver over to such receiver the property in controversy.

It has been urged in consultation, that the provisions of the Code above referred to are so plain, as not to admit of construction, and hence the appointment by the register as shown by the record, and the attempt to delegate such authority to him in violation of the statute, is, in legal contemplation, a usurpation of jurisdiction, for which a writ of prohibition lies, and not an error of judgment in the construction of the statutes, which, if revisable at all, could only be reviewed on error.

I submit, with all becoming deference, that this argument is a *petitio principii*. It begs as the predicate the major proposition, namely, that the provisions of the Code referred to are not proper subjects of judicial construction. This granted, and the conclusion may well enough stand; but I feel constrained to take issue upon the predicate.

I admit, that the proper practice is, for the Chancellor, after he has determined that the case made is one proper for a receiver to be appointed, to refer it to the register to select and recommend a fit and proper person to fill that office by the Chancellor's appointment, and it would be proper for the register to give notice to the parties, when he would ascertain that fact, so as to afford them an opportunity of being heard; but I do not, by any means, concede that the law is so plain on this point as not to admit of doubt, and to exclude the idea of judicial construction.

I think it may well admit of controversy whether the order of the Chancellor is not in compliance with the spirit and intention of the law makers. He has decided on the equities of the parties with reference to the appointment, has defined the duties, prescribed the powers, given directions as to the security; and the only matter referred to the master is, to appoint, by which is clearly meant the designation of the person to fill the office, and the receipt and approval of his bond.

This selection of the person could doubtless be as well and better made oftentimes by the register than the Chancellor ; for he resides in the county from which the receiver would ordinarily come, and may well be supposed to have personal knowledge of the party whom he would designate ; whereas the Chancellor may reside a great distance off. But, as determining whether a receiver shall be appointed involves the exercise of high judicial functions, the register may well be deemed incompetent for this duty.

So, in England, the masters have no power to appoint receivers, but the Chancellors only, yet the Chancellors determine upon the equity, and say whether a receiver shall be appointed, and then make the appointment through the master. Mr. Daniel in his Chancery Pleading and Practice, page 1976, says: "The order, when made, usually refers it to the master to appoint a proper person to be the receiver," &c.—See also 1 Smith's Ch. Pr. 631. The master's report needs no confirmation, and is conclusive, unless some substantial objection be made to the Chancellor by petition.—1 Sm. Ch. Pr. 635-6.

True, the letter of the statute is opposed to the order before us ; but the crowning virtue of the Chancery Court, and one ground of its original jurisdiction, if I mistake not, was, that it would depart from the letter, in order to attain the spirit and true meaning of the statute ; hence the familiar term "the equity of the statute." . The statute of frauds and perjuries declares that no action shall be brought to charge any person on any contract for the sale of land, &c., unless the promise or agreement, or some note or memorandum thereof, shall be in writing and signed by the party to be charged, &c. Yet did any one ever suppose that a prohibition lay to the Court of Equity, which, in the face of the letter of the statute, entertained bills for the specific execution of parol contracts, in cases where the refusal of the defendants to perform them operated frauds upon the purchasers ?

It matters not, therefore, in my conception, that the letter of the statute is opposed to the order ; the question still remains, Is there not room for construction and doubt, as to the true intent and meaning of the statute ? There are many reasons in addition to these I have mentioned, such as injury and expense from delay and several trips to distant points in search of the

Chancellor, first, to settle upon whether a receiver is proper, then to appoint him after a fit selection has been made, either by proposals of the party to the register or his selection unaided by them, and then he is not to be inducted into office until his bond is approved. I refer to these inconveniences, merely to show that it is not at all improbable, or at least not so clear as to admit of no ground for doubt, that the legislature or codifiers intended by the term "appoint" to require the Chancellor alone to determine whether a receiver should be appointed, but left him the usual and ordinary means of selecting the appointee by his register, as is the practice elsewhere.—Danl. Ch. Pr. 1976; Att'y Gen. v. Bank Columbia, 1 Paige 511; 1 Sm. Ch. Pr. 631, 635-6.

I come, therefore, to the conclusion that the order of the Chancellor was, at most, but an erroneous construction of the provisions of the Code; that he had the jurisdiction to determine upon the spirit and meaning of its provisions: (State v. Benj. Scott, 1 Bailey's Rep. 294-5 ;) and that he has done, by an erroneous process, what we all agree he had the right and authority to do in a different mode : that is to say, a receiver has been appointed, and this was right; but he has by the order of the Chancellor been appointed by the register, whereas the Chancellor should have designated the person to fill the office. But having jurisdiction to appoint, and having erred merely in the manner of making it, the authorities, I believe, are all agreed that no writ of prohibition lies to correct errors.—*In re* Bowen, 7 Law & Eq. Rep. (Eng.) 392; 3 Rich. R. 111–114; Buller J. in Home v. Ld. Camden, 4 T. Rep. 397 ; 5 Ark. R. 21; 4 Per. & D. 228.

But there is another ground upon which I think it clear that this court should not interfere. The Chancellor has full power to displace the receiver upon the application of the defendant, if an improper person has been appointed, or to re-appoint and require another bond, if the register's appointment conferred no authority upon the receiver. No application has, however, been made to him, nor has any objection been made to the appointee as an unfit person; but the complaint is, that any one should have been appointed, by reason of a want of jurisdiction on the part of the Chancellor.

The rule at common law is, that no prohibition lay to an in-

ferior court for matters arising out of their jurisdiction, until that matter had been pleaded, and the plea refused.

By analogy to this rule, the defendant should, before applying to this court for aid, have presented the matter to the Chancellor by petition to modify or correct the order which he made in vacation. Until then, he had no right to conclude that the Chancellor would refuse to make the appointment himself, so as to avoid all question as to the power of the register under the order which he had made.

What are we called upon to do? Certainly not to say to the Chancellor that he shall not appoint a receiver. We all agree that he should do this; that he has ample jurisdiction over this matter. But he has exercised his jurisdiction improperly, it is said; then, I answer in the language of Lord Loughborough: " That the court has decided wrong, is ground of appeal, or of review, but not a ground of prohibition." And I venture to assert from a very thorough examination of the authorities, that not a single case can be found, where a court of general jurisdiction has proceeded erroneously in a matter confessedly and beyond doubt within its cognizance, that a prohibition has been awarded.— That, in my judgment, is the precise case before us. It is said in this case, that the Chancellor has enjoined the party from the commission of a trespass, and that this is beyond his jurisdiction, though he has jurisdiction generally over the subject of granting injunctions. Upon parity of reasoning, if the prohibition goes as to the matter of the receiver, it should be awarded as to the injunction; the Chancellor has equal power over both.

I think the conclusion attained by the majority of the court, if carried out in its practical bearings and analogies, will greatly tend to trammel and embarrass the administration of justice in the primary courts. Every error, in one sense, is an excess of jurisdiction, for the court has no authority or right to make a wrong decision; but to hold that the inferior courts should be arraigned before this tribunal, for errors in their interlocutory orders in appointing receivers or granting injunctions or *ne exeats*, and the like, would amount almost to a denial of justice in many cases, for a complainant might be required to come to this court at every stage of his case, to defend the orders supposed to have been erroneously made in it.

Can any case be found where prohibition has gone to the

Chancellor, having general jurisdiction in chancery matters, to control his action in the matter of injunction? Not one, I apprehend. Now, he has equal jurisdiction over the subject of appointing receivers. He has taken the property into his custody, and has the acknowledged right to retain it in the custody of the law; he has reached the proper destination, but has gone there by a wrong road; and the effort now is, to require him to retrace his steps, so as to reach the same place by the right road. Such being the case, and having a discretion, I should certainly upon that ground, if for no other reason, refuse the writ.

I have not cited the authorities, although I have examined them, inasmuch as I think this case is resolved upon the plain principle, that this court will not grant a prohibition to an inferior court for an erroneous judgment, or proceeding, in reference to a matter clearly and confessedly within its jurisdiction. Grant v. Gould, 2 Hen. Bl. 69, clearly shows, as I think, the correctness of my conclusion. I think the prohibition should be refused.

LIGON, J.—1. I hold, that the order made by the Chancellor, directing the register to appoint a receiver to take charge of the estate and property now held in common by the parties, is not only without authority of law, but directly forbidden by our statutes; and, as this is the case, the appointment is absolutely void, and the person so appointed, so far as he intermeddles with the property, with no other authority for so doing than this appointment of the register, is a trespasser.

To prove the first of the above propositions, it is only necessary to place the interlocutory order of the Chancellor and the statutes of the State in juxta-position. That order is in these words: " It is ordered that a receiver be appointed to take possession of the plantation, negroes, horses, mules, stock and provisions mentioned in the bill, and for which a receiver is therein prayed, and also to take charge of every thing on the plantation necessary to carry on the plantation operations, and that said receiver proceed to make and gather the crops, and dispose of the cotton when ready for market; and that he and either of the parties have leave to apply to the court for any other or further directions to him as may be necessary. And, that it be referred to the register of the Court of Chancery at Hayneville to appoint a

fit and proper person to be the receiver aforesaid of said property and crops : the person so to be appointed first giving bond in the sum of $25000, to be approved by the register, truly to account for and pay over what moneys he may receive therefrom, and account for and deliver the property so received by him according to the order and directions of the court." Morgan Smith was ordered to deliver the property to such receiver.

Section 2986 of the Code reads as follows : " Receivers can only be appointed by the Chancellor ; and when the application is made in vacation, reasonable notice of the time of such application, and the person to whom it will be submitted, must be given, or a good reason shown to the Chancellor for the failure to give the same." The statute defining the powers of registers in chancery provides, " He has no authority to grant injunctions, or to dissolve the same, or to appoint receivers."— Code § 622.

These statutes are highly and positively restrictive in their character, and the legislative will is expressed in terms so plain and unequivocal, that they need no construction, and defy all cavil. The order of the Chancellor, in that portion of it which directs the register to appoint a receiver in this case, uses the same term employed in the statute, and is as little equivocal; but it commands the register to do that, which the statute says he shall not do. The two are directly repugnant to each other, and both cannot stand. In such case the order is a nullity, and can confer neither power nor right on any person whatever.

It can derive no aid from our 51st rule of chancery practice. That rule is in these words : " The rules of the English Court of Chancery, not inconsistent with the statutes of this State and the rules and decisions of this court, so far as consistent with the institutions of this country, are hereby adopted as rules of practice in courts of chancery in this State."—Clay's Dig. 418, rule 51.

Now, suppose the English practice to be, as it is said to be in the argument, that the Chancellor has the power to appoint receivers, but may, and does by his order, delegate it to the master in chancery, and the latter really makes the appointment. Still, I answer, this rule has not been adopted here, because it allows some other officer than the Chancellor to appoint a receiver, and is therefore inconsistent with our statute, which says in

unequivocal terms, " receivers can only · be appointed by the Chancellor," and being so, is expressly excluded from our rules of chancery practice by the terms of our 51st rule.

· It is also inconsistent with section 622 of our statutes, which expressly prohibits the register (who is also master in chancery in our system,) from appointing receivers.

Thus, the argument in support of the order of the Chancellor in this case, drawn from the English chancery, in connection with the 51st rule of our practice, falls to the ground,

But it is said, that the spirit, if not the letter of our statute, would probably justify the order of the Chancellor in this case, and the act of the register in appointing the receiver. I confess, that in relation to the sections 2987 and 622 of our Code, I am unable to appreciate this position. When the language of a statute is plain, clear, direct and intelligible, and wholly incapable of misconstruction, as · is the case with the sections referred to above, there is no room for construction; and I do not feel authorized to throw aside the language, and go upon the hunt after a spirit of the words, which, when found, will contradict their clear import, and nullify their legitimate meaning.

It is also said, that the order of the Chancellor in relation to the appointment of a receiver may be regarded as a substantial appointment of that officer. Let us see whether the Chancellor so understood himself. The language of the first part of the order is, " that a receiver be appointed to take charge of " &c, If it had then proceeded to name a person to fill that office, all would have been well, and the words quoted would have amounted to a present command, and would have been an appointment of such person to the office. But this is not the case. No person is named for the office, and it would scarcely be contended that under this general language any person could assume to act as receiver. This part of the Chancellor's order can only import his judgment that the case presented by the bill and *ex parte* affidavits, was one in which it was proper to appoint a receiver. This is clear from the after part of the order, in which he directs, " that it be referred to the register of the Court of Chancery at Hayneville to appoint a fit and proper person to be the receiver aforesaid of said property and crops : the person so to be appointed first giving bond &c." Had the Chancellor thought that the receiver had been appointed

by himself, why does he mention another, whose duty he makes it "to appoint" him, and speak of the appointment and the person "so to be appointed" as things yet future, and acts yet to be done?

The language of the order cannot, in my opinion, bear the interpretation contended for, on any legitimate construction which can be given to it. Nor can I suppose, that the Chancellor used the word "appoint" in one sense, in one part of the order, and in a different sense in another. That word in the statutes and in the order being used in the same connection, must be understood in the same sense.

It is clear that the register understood the order, as I think the Chancellor understood it himself, for he forthwith proceeds to appoint Frank J. Smith, take his bond, and install him in office as receiver.

It is, however, unimportant how the terms of the order were understood by the Chancellor: it is sufficient that it gives to the register power to appoint a receiver, and to this extent it is void, because the statute prohibits the register from the exercise of such a power, and confines it exclusively to the Chancellor.

This is not a mere error in a case clearly within the jurisdiction of the Chancellor, but the exercise of a power clearly beyond his jurisdiction; and in such case the act done is, to my mind, as clearly void as are the acts and judgments of inferior courts of limited jurisdiction, when their records fail to show every fact necessary to cause their jurisdiction to attach.

2. I admit, that it is discretionary with this court to grant or refuse the writ of prohibition, and that it should never go unless the party applying for it has no other remedy to which he can resort for his protection; and then, only in cases in which the inferior courts have clearly exceeded their jurisdiction in the order complained of.

But I do not confine its issue to courts of limited jurisdiction, strictly speaking. Nor do I derive the power of this court to issue writs from the common law. It is conferred on us by the constitution of this State, and to this, and this alone, I resort to ascertain the courts subject to be restrained or prohibited by the Supreme Court. In this view, it is wholly unimportant whether the English Court of King's Bench, or any other re-

visory court of that kingdom, ever issued a prohibition to an inferior court of general jurisdiction or not; if our constitution confers that power on us, we may exercise it, although the Court of King's Bench could not do so in England. . To the English books and cases I am willing to go, in order to consult them for proper cases in which to use my discretion in granting the writ; but not to learn our power to award it, or the courts to which it may be sent.

It may not be out of the way here, to remark that, in the numerous cases which we have examined'from the English books, we have been unable to find one in which a prohibition has been granted to a court of general jurisdiction. The courts which have been prohibited in that country are those of a limited or particular jurisdiction, and those only. It would seem from this, that such courts are not subject to prohibition in England, and if, in our search for authority to prohibit courts of general jurisdiction, (if any inferior court can rightly be so styled,) we confine ourselves alone to English books, and the practice of the higher English courts, there will be found no warrant for it whatever.

But the constitution of Alabama declares, "that the Supreme Court shall have power to issue writs of injunction, *mandamus, quo warranto, habeas corpus,* and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions."—Con. of Ala. Art. 5 § 2.

Here both the power to issue writs of the class of the one here prayed for, and the courts to which they may go, are to be found. These courts are described as " inferior jurisdictions." The term inferior is a relative and comparative one. In respect to the Circuit Court, the Courts of Probate and justices of the peace may be said to be inferior jurisdictions, because the decisions and acts of the latter are subject to be reviewed by the former. So, also, is the Probate Court inferior to the Chancery Court for the same reason. In respect to the Supreme Court, all others are inferior, for this has "appellate jurisdiction, coextensive with the State," and " a general superintendence and control of inferior jurisdictions."—Nugent v. The State, 18 A. R. 521.

It is immaterial, under this view of the powers of this court,

whether the inferior court, whose action we are called on to control, be a court of general or limited jurisdiction. How much this consideration should weigh with us in exercising that power, is a different question altogether.

I think it clear, that where an inferior court makes an order, which it has no authority to make, while the case is in progress, and this order is immediately injurious to the rights of the suitor, and tends to oppress him, it is the plain and imperative duty of this court to interfere when called upon, and arrest the execution of the illegal and oppressive order. But, if such unauthorized act is done at such a stage of the proceedings as will authorize the party complaining of it to prosecute an appeal or writ of error, an extraordinary remedial writ should never be granted.

The order in this case was made at the beginning of the suit, and, unless the defendant is relieved from its operation, must continue to deprive him of the control and use of his property for the remainder of the present year; and it divests him of the power to receive or enjoy the proceeds of his crop when grown and sent to market. It, in fact, shuts him out of the use of the provisions laid in to supply food for the present year.— Our rules of practice allow him no appeal or writ of error, and, without the intervention of this court, he must suffer the wrong done him by the void order, during the period of a highly litigated chancery suit.

It is no sufficient answer to this to say that, as the case is a proper one for the appointment of a receiver, (and I concede this in the present aspect of this record,) the Chancellor may proceed and appoint one himself. Be it so. Such a receiver would come in according to law, and be no trespasser, as the present one is; and thus the rights of the suitor will be protected, and the laws of the land vindicated.

But it seems to be doubted, whether the orders and judgments of inferior courts of general jurisdiction, when made under a mistake of their jurisdiction, or in cases in which they exceed their jurisdiction, stand on the same footing with similar orders made by inferior courts of limited jurisdiction, with respect to this writ. It is supposed that the former are regarded as mere errors, while the latter are void.

I have been unable to find any such distinction taken in the books, and I can see no good reason why it should exist. An

order made, or judgment rendered, by a court which had no ju-
risdiction of the matter to which it relates, is universally styled
" a nullity," or "merely void," irrespective of the fact that
the court is one of limited or general jurisdiction.

Thus, if the Circuit Courts render a judgment, or the Chancery
Courts a decree, against a suitor who has died pending the liti-
gation, and before the rendition of such judgment or decree, such
judgment or decree is a nullity, although these courts have full ju-
risdiction of the subject matter of the controversy.—11 N. H. 191.

So, a judgment not founded on the service of mesne process,
nor rendered on confession or the voluntary appearance of the
party, is a nullity, and gives the party who obtains it no right as
against the defendant, notwithstanding the court had jurisdiction
to render such judgment between the parties, had they been
rightly before it.—Enos v. Smith, 7 Sm. & Mar. 85 ; McComb
v. Ellett, 8 Sm. & Mar. 505 ; 2 McLean 51.

Although a court be one of general jurisdiction, in the common
acceptation of that term, still, if it fail to observe the rules nec-
essary to enable it to act as between the parties to a particular
suit, and cause its jurisdiction to attach to that case, by giving
notice to the defendant, its action will be *coram non judice* and
void. If the rights of suitors are about to be injuriously affec-
ted by the execution of such void judgment, there is no satis-
factory reason existing, within my knowledge, why the oppres-
sion and wrong threatened may not as well be prohibited, when
the law allows no appeal or writ of error, as if the void order or
judgment had been made or rendered by a court of limited ju-
risdiction, as that term is ordinarily understood.

When a court of inferior jurisdiction fails or refuses to pro-
ceed in a cause, rightly and properly before it, the party in-
jured applies to this court; and when he has made out his case,
we award a *mandamus* to the court below, by which it is com-
manded to proceed with the cause. I can see no reason why we
should not as willingly hear, and as speedily redress, the wrongs
of a suitor who is about to be, or has been injured by the ille-
gel and unwarrantable acts of those courts, in matters wherein
they exceed their jurisdiction. And this is the office of a writ
of prohibition.

But neither should be granted when the wrong done could be
redressed by appeal or writ of error. Neither of these remedies

is, however, allowed in the present case, and it is my clear conviction, that the party applying is entitled to a writ of prohibition.

It is said, however, that, before this court should act in the premises, the matter complained of should be brought before the Chancellor, that he may have an opportunity of correcting the error, and that where complaint is made of an unwarrantable exercise of power by an inferior court, the objection should be taken in that court before it is allowed to be heard here. It is also said, that a prohibition will not go after the inferior court has acted.

The case of the State v. Scott, 1 Bailey 294, is cited to sustain this view. I do not so understand that case. It expressly holds that the party complaining of the exercise of unwarrantable power by the inferior court, is not bound to plead the want of jurisdiction in that court, if such want of jurisdiction appears by the face of the proceedings; and upon the authority of Bacon it is there said, "the superior court will interfere, even after sentence, and restrain the inferior court by prohibition." Bacon's Ab., title Prohibition.

The majority of the court concurring in the propriety of issuing the writ of prohibition, it is ordered that a writ of prohibition issue to the Hon. Joseph W. Lesesne, Chancellor of the southern division of the State of Alabama, commanding and enjoining him, without delay, to revoke and annul, or to cause to be revoked and annulled, the order made in the case of Sarah O. Smith, by her next friend, &c. v. Morgan Smith, now pending before him in the Chancery Court held for the County of Lowndes, in said State, by which the register in chancery at Hayneville, in said County of Lowndes, is directed and ordered to appoint a fit and proper person to be receiver of the estate and property mentioned in the proceedings in said cause, and under which Frank J. Smith has been appointed such receiver; and wholly to absolve and release the said Morgan Smith from the effect and operation of said order to said register, under which the said F. J. Smith was appointed receiver as aforesaid.

GOLDTHWAITE, J.—In relation to the power of this court to grant a prohibition to the Court of Chancery in a proper case, I entertain no doubt.

Upon the matter of the bill, I am satisfied that the Chancellor had jurisdiction, and that upon the case, as made by it, he had authority to appoint a receiver. I do not say it was a correc exercise of that authority, for I do not consider that question as presented upon the present application, and for that reason I have formed no opinion in relation to it. Having, however, jurisdiction so far as that matter was concerned, it was, unquestionably, the duty of the Chancellor to proceed upon his own convictions as to whether the case before him required the property to be committed to the custody and management of a receiver; and if he has erred as to this question, it was simply an error, which could be reversed on appeal, but which would constitute no ground for a prohibition.

In relation to the order made by the Chancellor, directing the register to appoint a receiver, I have more difficulty. It has been urged that the Code, in direct terms, prohibits the register from appointing receivers, and confines this power to the Chancellor alone; and this, I think, is the correct construction of the law. The words of the sections of the Code referred to (§§ 622, 2986) are clear, and must be taken in their ordinary sense. The appointment of a receiver is not a mere ministerial act, but one requiring the exercise of judgment and discretion. It implies the selection of a fit and proper person to manage the property, and, although the Chancellor might very properly call upon the register to aid him in making the appointment, I do not think he could delegate the power of appointment to him; and in so doing, I am clear that the Chancellor committed an error. But is it such a one as will warrant a prohibition? The general ground on which this writ is granted, is, where the inferior court has either acted without jurisdiction, or where it has assumed to proceed in a case of which it has no cognizance, or where it has exceeded its jurisdiction, by doing some act in the progress of a case which, under the law, it has no authority to do.—3 Black. Com. The cases cited by the learned commentator to sustain the last position, as to the question of excess of jurisdiction, all refer to courts of special jurisdiction; and I am inclined to the opinion that the courts of Westminster do make this distinction, but it does not apply with us, for the reason, that the constitution has conferred upon this court the power to control inferior jurisdictions (Art. 5, §2);

and the Court of Chancery is an inferior jurisdiction within the meaning of that instrument. If that court transcends its powers, and exceeds its authority, I am unable to perceive any valid reason why its action should not be controlled as well as special jurisdictions. The same reasons which would require the exercise of a controlling power in relation to other courts, apply equally to it, and the constitution has, in express terms, provided for its exercise by this court; so that I cannot think that the distinctions, if any exist at the common law, between courts of general and special jurisdiction, in relation to the grant of prohibitions, exist with us.

Upon authority, I regard it as clear that, when a court of limited or special jurisdiction exceeds its authority, although upon the misconstruction of a statute, which it is called upon, in the discharge of its legitimate duties, to construe, it furnishes ground for a prohibition. This is shown by the language of Blackstone, who, in speaking of this writ, says, that it lies when "in the handling of matters clearly within their cognizance, they (the courts) transgress the bounds prescribed to them by the laws of England, as where they require two witnesses to prove the payment of a legacy, a release of tithes, or the like,"—3 Black. Com. 112; and is laid down more clearly in the case of Grant v. Gould, 2 H. Black. 69, where the whole doctrine applicable to prohibitions was elaborately and ably discussed.— In that case, Lord Loughborough says: "Another ground of prohibition is, where an act has passed with respect to any authority resident in other courts, as in the ecclesiastical courts in which there is an inherent jurisdiction. In such a case, the courts of Westminster Hall have conceived that where the authority is limited by an act of Parliament, the court which acted differently from the act, was, in that instance, exceeding its jurisdiction, and therefore liable to a prohibition." Applying these principles to the case before us, it is clear that, if the construction I have given to the provisions of the Code is correct, the Chancellor, in directing the register to appoint a receiver, has, in the words of Lord Loughborough, "acted differently from the act," and in doing so has exceeded his powers. It was an act which, under the statute, he had no authority to do; and granting, for argument's sake, that the provisions of the Code regulating the appointment of the receiver were

such as afford some ground to warrant the construction given them by the action of the Chancellor, in delegating the appointment to the register, I regard that circumstance as entitled to no consideration whatever. It is conceded that the Chancellor believed that he was authorized by law to make the order, and such, we suppose, is the case in every instance in which courts exceed their jurisdiction. They err in relation to the law, and the superintending court exercises its authority, not merely because they have mistaken the law, or misconstrued the statute, but because, acting upon that error, they have gone beyond their legitimate powers. It can make no difference to the party complaining whether the act arises from a misconstruction or a wanton violation of the law. It has been supposed that the decision of the Queen's Bench in the matter of Bowen is adverse to the application of the relator ; but that case is clearly distinguishable from the one under consideration. There the question arose upon the statute of 5th and 6th Vict. c. 116, which gave to the County Court the power to grant protection from process in the case of a trader, where he owes debts amounting in the whole to less than £300. It appeared that the insolvent had obtained protection under a prior order, and the debts at the time of his subsequent petition amounted, with the debts at the time of the former order, to more than £300, all of which were unpaid. The County Court granted the protection, and the prohibition was applied for, on the ground that the judge of the County Court had no jurisdiction to grant the protection, as the debts then owing by the petitioner exceeded £300. The judgment of the court was against the prohibition, on the ground that the County Court judge had the right to determine whether the debts owing by the trader were above or below £300 ; and to do this, he might decide whether what remained due under the former insolvency was to be taken into account in making up that sum. The decision, in my opinion, was clearly correct, as the question determined was clearly within the jurisdiction of the inferior court, and the decision rests upon that ground. But this is not the case here. The Chancellor had the right to appoint a receiver, and must determine, upon the facts before him, whether it is a proper case. If he determines wrong, it is an error within his jurisdiction, and so far is analogous to the case just referred to, and a prohibition will not lie. But the

Chancellor had no authority to delegate this power of appointment, which was a discretion reposed in himself solely, to another ; in doing this, he went beyond his jurisdiction, and an error of this description is ground for a prohibition.

.The fact that the Chancellor could appoint the same person receiver, on an application to him, does not, in my opinion, affect the question, except as it may influence the court in the exercise of its discretion in granting the writ. If it was certain that the application would be renewed, and the same person appointed, as I entertain great doubt as to the authority of the person in possession under the present appointment, to discharge the duties which devolve upon him in the capacity of receiver, I should be in favor of granting the writ, in order that he, or some one else, might be invested with the authority necessary to protect himself and the property, as well as to avoid any collision between himself and the other parties.

PHELAN, J.—Can prohibition go only as to courts of limited or special jurisdiction, and where such courts act without jurisdiction; or, will it also lie as to courts of general jurisdiction, and where such latter courts exceed their jurisdiction ?

Whatever may be the rule of the English courts, or of such of our American courts as follow their rule, I am of opinion that, under the constitution of Alabama, the Supreme Court may, in a proper case, issue a writ of prohibition even to a court having general jurisdiction. The constitutional grant of power, and the duty which attaches to that grant, embrace, as I conceive, all subordinate tribunals.

To state my conclusions in this case in few words, I may say that I am convinced that this court may issue a prohibition to any subordinate tribunal whatever in this State, and that this writ will properly lie where the subordinate tribunal acts without jurisdiction, or, what is the same thing, exceeds its proper jurisdiction, and there is no other adequate remedy for the injury that may result from the illegal action of such court.

Furthermore, I am clear, in this case, that the Chancellor exceeded his jurisdiction in directing the register to appoint a receiver. That was a judicial act, which he "only" by express law was competent to do. The designation of the individual is, as I conceive, an indispensable part of the duty confided by

statute to the Chancellor alone. He is required, not only to decide that the case is a proper one for a receiver, but he is bound to exercise judicial functions in the selection of the individual upon whom this office or trust is to be conferred. I was, at one time, inclined to the opinion that the provisions of the Code to this effect were too plain to admit of construction, but this on further reflection I surrender; but I do this more in deference to the division which exists here, and the action of the Chancellor, than to the convictions of my own reason on the letter of the statute simply.

The appointment, then, in this case was, as I conceive, not only without law, but contrary to express law in a matter of jurisdiction, and so void.

Is there any adequate remedy for this wrong, as respects the respondent Morgan Smith? None, that I can see. The case, as made by the record, would, I agree, well justify the appointment of a receiver ; but then he must be appointed according to law, or this court is bound, I think, to interpose, when a proper application is made, by prohibition, to arrest or prevent a wrong which may otherwise run through the whole subsequent proceedings, producing great confusion and probable damage to Smith, or to some person on the opposite side who may participate in the transactions by reason of this order, and because I see no other way to prevent such wrong and its probable consequences.

That persons injured may have their remedy by suit after the injury is consummated, is not, to my mind, a sufficient answer to an application for preventive justice, where the action complained of is that of a judicial officer or tribunal, and respects an act professedly judicial, and the proceeding is in *fieri*.

For these reasons, I concur in allowing the writ of prohibition.

GIBBONS, J.—I concur in the views expressed in the foregoing opinion of the Chief Justice.