## TURNER v. SMITH.

1. Under the act of 6th February, 1863 (12 Stat. at Large, 640), "to amend an act entitled 'An Act for the Collection of Direct Taxes in Insurrectionary Districts, &c., approved June 7th, 1862,'" which said amendatory act was intended to be a *substitute* for the seventh section of the said previous act of June 7th, 1862 (Ib. 422), the commissioners of taxes, though "*authorized*" to bid off property to the United States "at a sum *not exceeding* two-thirds of its assessed value," are not bound so to bid it up so as to make it bring in all cases that much.
2. Under these acts the tax commissioners are not bound to hunt up the real owners: The tax laid is a direct tax on the land and on all the estates, interests, and claims connected with or growing out of it.
3. A rent charge is accordingly cut off and destroyed by a sale of the land.

ERROR to the Supreme Court of Virginia; the case being this:

Hannon being owner in fee simple and free from lien of a house and lot in Alexandria, granted out of it by an old-fashioned formal ground-rent deed, with clause of right of re-entry, &c., in 1819, a rent charge of $224 to Moore, with right of distress, re-entry, &c. In 1821 Hannon died insolvent, and the rent not being paid, Moore "took possession" of the house again, though in what mode or whether with any of the requisites of a common law re-entry did not appear.

In 1825 being still in possession he conveyed the rent charge, describing it in form, to one Irwin, and Irwin in 1854 conveyed it *with the lot on which it was charged* to R. M. and J. M. Smith; Irwin and Smith, each respectively, being

in possession of the house and lot, after they became owners of the rent, as Moore had, himself, been after Hannon's death; and each paying the taxes assessed against the house and lot while he held it.

In May, 1861, on the outbreak of the rebellion, Smith abandoned his residence and went within the rebel lines.

On the 5th of August of that year,* Congress passed an act laying a "direct tax of $20,000,000 annually upon the United States," and apportioning the same in a manner which it set forth, among the several States. The act provided particularly for assessing and collecting of the tax, directing that it should be collected from persons at their dwellings, in the first instance; and if not paid should be obtained by distress and sale of personal property; and if persons could not be found, and there was no personal property, then "by public sale of so much of the said property as shall be necessary to satisfy the taxes due thereon, together with an addition of 20 per cent." The act then provided for giving a deed, *but did not in any part declare what should be the effect of the sale or deed, or that it should divest liens of any kind.*

The act authorized each State to assume, assess, collect, and pay its quota of the tax; and the loyal States did do this. In the rebel States nothing could be done.

On the 7th of June, 1862,† Congress passed another act, entitled "An Act for the Collection of Direct Taxes in Insurrectionary Districts," &c. The act enacted:

"SECTION 1. That when, in any State, .... by reason of insurrection or rebellion, the civil authority of the government of the United States is obstructed so that the provisions of the act approved August 5th, 1861 [the act last above mentioned], cannot be peaceably executed, the said direct taxes by the said act apportioned among the several States, &c., shall be apportioned and charged in each, upon all the lands or lots of ground situate therein respectively ... as the said lands or lots of ground were enumerated and valued under the last assessment and valuation

---

* 12 Stat. at Large, 294.                    † Ib. 423.

thereof, made under the authority of said State . . . previous to the 1st day of January, 1861; and each and every parcel of the said lands, according to the said valuation, is hereby declared to be . . . charged with the payment of so much of the whole tax laid and apportioned by said act upon the State, &c., wherein the same is respectively situate, as shall bear the same direct proportion to the whole amount of the direct tax apportioned to said State, &c., as the value of said parcels of land shall respectively bear to the whole valuation of the real estate in said State, according to the said assessment and valuation made under the authority of the same. And, in addition thereto, a penalty of 50 per cent. of said tax shall be charged thereon.

"SECTION 2. That on or before the 1st day of July next, the President by his proclamation shall declare in what States and parts of States said insurrection exists, and thereupon the said several lots or parcels of land shall become charged respectively with their respective portions of said direct tax, and the same, together with the penalty, shall be a lien thereon without any other or further proceeding whatever.

"SECTION 3. That it shall be lawful for the owner or owners of said lots or parcels of lands within sixty days after the tax commissioners herein named shall have fixed the amount, to pay the tax thus charged, &c.

"SECTION 4. That the title of, in, and to each and every piece or parcel of land upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States; and *upon the sale hereinafter provided for, shall vest in the United States or in the purchasers at such sale, in fee simple, free and discharged from all prior liens, incumbrances, right, title, and claim whatsoever.*

"SECTION 5. That the President of the United States, by and with the advice and consent of the Senate, may appoint a board of three tax commissioners, &c.

"SECTION 7. That the said board of commissioners shall be required, in case the taxes charged on the said lots shall not be paid, . . . to cause the same to be advertised for sale; and at the time and place of sale to cause the same to be severally sold to the highest bidder for a sum not less than the taxes, penalty, and costs, and 10 per cent. per annum interest on said tax, pursuant to said notice; [*and the said commissioners shall at said sale strike off the same severally to the United States, at that sum,*

*unless some person shall bid the same or a larger sum,*] who shall upon paying the purchase-money . . . be entitled to receive from such commissioners their certificate of sale; which said certificate shall be received in all courts and places as *primâ facie* evidence of the regularity and validity of such sale, and of the title of said purchaser under the same: *Provided,* that the owner of said lots of ground, *or any loyal person of the United States having any valid lien upon or interest in the same,* may at any time within sixty days after said sale appear before the said board of tax commissioners . . . and . . . upon paying the amount of said tax and penalty, with interest, &c:, together with the expenses of sale and subsequent proceedings, *may redeem* said lots of land from said sale."

On the 6th of February, 1863,* Congress passed a short "act to amend" this act above so largely quoted, and entitled "An Act for the Collection of Direct Taxes in Insurrectionary Districts," &c. The new act says that the old act shall be amended so as to read as follows in section 7:

"That the said board of commissioners shall be *required,* . . . at the time and place of sale, to cause the same to be severally sold to the highest bidder for a sum not less than the taxes, penalty, and costs, and 10 per centum per annum interest on said **tax,** pursuant to notice, [in all cases where the owner of said lots or parcels of ground shall not, on or before the day of sale, appear in person before the board of commissioners and pay the amount of said tax, with 10 per centum interest thereon, with costs of advertising the same, or request the same to be struck off to a purchaser for a less sum than two-thirds of the assessed value of said several lots or parcels of ground, the said commissioners shall be *authorized,* at said sale, to bid off the same for the United States at a sum *not exceeding two-thirds of the assessed value thereof,* unless some person shall bid a larger sum."]

The part in [ ] of the new section is a change, it will be seen, upon the part of the old one (*supra,* pp. 555–6) in similar [ ].

In a subsequent part of it, this substituted section 7, makes, like the old one, a right of redemption of the land

---

* 12 Stat. at Large, 640.

sold (within sixty days), "to any loyal person of the United States having any valid lien upon or interest in the same;" with a provision for persons under disabilities, &c.

With these statutes on the statute-book, and the property in Alexandria, mentioned at the beginning of this statement, being assessed on the land-book of Virginia, on the 1st of March, 1864, at $3500, the tax commissioners of the United States (not themselves bidding at all) sold it, in professed pursuance of the acts of Congress, for $1750 (less than two-thirds, $2333, of its assessed value) to one Turner, describing it as a house on Royal Street, between King and Prince Streets at Alexandria, in the State of Virginia, "*said to have belonged to R. M. and J. M. Smith,*" and charged to them on the land-book of the State aforesaid for the year 1860.

The rebellion being suppressed the Smiths—*never having offered as "holders of a valid lien" or otherwise to redeem*—brought suit in proper form against Turner to recover certain arrears of the ground-rent. Turner claimed title to the lot free of rent under the sale for taxes, made by authority of the several acts of Congress, already mentioned, for imposing and collecting a direct tax. The decision of the court where the suit was brought was *against* the title thus set up, that is to say, it was in favor of the Smiths, and their rent, and this decision being affirmed in the highest court of the State,[*] the case was here for review.

*Mr. F. L. Smith, for Turner, plaintiff in error:*

The length of time in which Moore and those who succeeded him were in possession, that is to say, the lapse of time from 1821 (when Hannon died and Moore resumed possession of his house) to 1864, when this sale was made, is sufficient to raise a presumption of either a re-entry in 1821 with all the requisite forms of the common law, or of a re-lease then or afterwards by Hannon's heirs. After such

---

[*] 18 Grattan, 835.

a term as forty-two years, almost any presumption necessary to sustain 'a party in possession will be made. By such a re-entry or release, a merger took place,* and there ceased to be two separate estates in the one property. The house and lot, free of ground-rent, thus became Smith's; and being regularly sold to Turner, he was owner of it discharged of all incumbrance.

This would all be so on principles of common law, but the fourth section of the act of June 7th, 1862, gives a disincumbered estate to the purchaser, even if the owner of the fee held it incumbered to its entire value. The estate may indeed be defeated by the holder of any valid lien, being a loyal person, if he redeem in the mode specified in the acts. But no such redemption is pretended. In any aspect, therefore, the judgment should be reversed.

*Mr. C. W. Wattles, contra:*

1. The case showed only that the *owner* of the rent charge took possession of the premises. A re-entry with common-law formalities cannot from this be inferred, nor a release from the heirs of the owner of the ground. The only inference is an act of trespass by the owner of the rent and a violation by him of the rights of his tenant. And this inference is made a certainty by Moore's conveyance of the rent *eo nomine* in 1825 to Irwin, as a thing then existing.

No time will run against a rent charge, so as to divest title or extinguish it. The limitation applies only to the recovery of rent in arrears by distress or action. The estate itself remains for all time unless merged or extinguished. The principle is elementary. The case then is that—

1st. Of a title to the land in Hannon's heirs, in fee simple (subject to the rent), at the time of the tax sale; a corporeal hereditament; and,

2d. Of a fee simple title to the rent charge in the Smiths; an incorporeal hereditament.

Hence there were two separate and distinct estates; one

---

* Chester *v.* Willes, 1 Ambler, 246.

of them, the land, was sold for the tax; the other, the rent, remained intact.

It would, indeed, be a forced construction to say that an incorporeal hereditament is a lien, incumbrance upon, or a right, title, or claim to land, in the sense contemplated by the act, for the rent may have been held by a citizen most devoted to the cause of the United States, and residing in a State not in insurrection; who could have no notice of a contemplated sale of his property, either directly or by the terms of the act, as it does not provide for a tax upon such species of property.

2. The land was sold for less than two-thirds of its value. This made the sale void. The act of 1863 requires the tax commissioners to bid off the land to the United States "at a sum not exceeding two-thirds of the assessed value." They did no such thing. The assessed value was $3500. Two-thirds of that sum is $2333.33. They sold it for $1750. Literally construed, indeed, the language "*authorized* to bid off" may be but permissive, and not mandatory. But it is a general rule of construction that where power is conferred by statute on public officers in language which, literally construed, is but permissive, the language will be construed as peremptory whenever the power is conferred for the benefit of the public or of individuals. And by no court has this doctrine been declared more emphatically than by this. Witness the case of *Supervisors* v. *United States*,* in which words so little mandatory in form as the words "*may, if deemed advisable*," were construed as imposing a positive and absolute duty; the court citing cases from old reports like Skinner and Salkeld; "leading cases on the subject," which it declares "have been followed in numerous English and American adjudications," to this day. In the present case the authority was conferred for the benefit of the government of the United States, representing the whole public; and the government had a right to claim its exercise by the commissioners as a duty imperative on them. Congress

---

* 4 Wallace, 435.

could not, by the act of 1863, have intended to leave the commissioners to say what lands should be bid off and what not; any more than it could have so intended by the act of 1862, in which, certainly, it did not so intend. It meant, in all cases, to take the land for the United States if it could be obtained on the terms specified in the act, and to deny authority to the commissioners to sell it to any other purchaser.

Mr. Justice MILLER delivered the opinion of the court.

Two propositions are relied on to defeat the title under the sale for taxes.

1. That the land was sold at the tax sale for less than two-thirds of its assessed value.

2. That the plaintiffs below, in whose favor the judgment was rendered, were the owners of a rent charge on the land, which was not extinguished by the sale for the unpaid taxes.

1. The first of these propositions is founded on the amendment to the seventh section of the act of June 7th, 1862, passed February 6th, 1863. The latter act undoubtedly was intended to be a substitute for the seventh section of the former, and to supersede it entirely. In a case of doubtful construction it is, therefore, important to consider what changes are made by the latter in regard to the matter now in controversy. By the original section the commissioners who were appointed for the collection of the tax were required, at the time and place of sale, to cause the lots and lands to be severally sold to the highest bidder for a sum not less than the tax, penalty, and costs, and 10 per centum per annum interest on said tax, pursuant to notice, and to strike off the same severally to the United States at that sum, unless some person should bid the same or a larger sum.

The amendment says that the commissioners shall be required, " at the time and place of sale, to cause the same to be severally sold to the highest bidder for a sum not less than the taxes, penalty, and costs, and 10 per centum per annum interest on said tax, pursuant to notice; in all cases

where the owners of said lots or parcels of ground shall not, on or before the day of sale, appear in person before the board of commissioners and pay the amount of said tax, with 10 per centum interest thereon, with costs of advertising the same, or request the same to be struck off to a purchaser for less than two-thirds of the assessed value of said several lots or parcels of ground, the said commissioners shall be authorized, at said sale, to bid off the same to the United States at a sum not exceeding two-thirds of the assessed value thereof, unless some person shall bid a larger sum."

The first act and the second are alike in the provision that the land shall be sold to the highest bidder for a sum not less than what is due on it for tax, interest, and cost. This, in both cases, refers to bids by others than the United States. In reference to bids made by the commissioners on behalf of the United States, there is a change. The first statute made it imperative that the commissioner should strike off the land to the United States at the amount of the tax, interest, and costs, unless others bid that or a larger sum; and it is a fair inference that the commissioners were not authorized to bid at all for the land, unless it be called a bid to strike it off to the government, when no one else would take it, for the tax, interest, and costs.

The second statute makes a material change in this part of the law. When the owner does not pay, or request the same to be struck off to a purchaser for a less sum than two-thirds of its value, the commissioners are authorized to bid off the same to the United States at a sum not exceeding two-thirds of such assessed value.

The intention in making this change seems to us to be to remove the restriction by which the United States must either take the land for the taxes, or let it go to whoever would pay the taxes, or any greater sum, if he was the highest bidder. After the amount due was offered the government was, by the first statute, no longer a competing bidder, and the owner was at the mercy of private bidders. Under the new statute the commissioner could become a

competitor after the amount of the tax was bid, with two limitations. First, he should not bid against a purchaser whom the owner, by request, preferred. And, secondly, he should not bid beyond two-thirds of the value.

Instead of being bound to bid that sum, he was *authorized* to bid any sum not *exceeding* that, and could not bid that if the purchaser requested that it might be struck off to a friend for less than that sum. If the language had been that he was authorized to bid it off at two-thirds, it would be a forced and unnatural construction of the section to hold that the words were imperative. The language which would express that idea would be that he was required to do it, or that he should not bid it off for a less sum. But here, while he is authorized to bid, that bid may be for any sum not exceeding two-thirds its value.

But the sale in this case comes within the first category. The United States did not bid at all. A private person bid a sum sufficient to pay the tax, interest, and cost, and the commissioner let him have it, and we see nothing in the statute which forbids it. Certainly we cannot infer because the United States authorized the commissioner in a defined contingency to bid off the land for a sum not *exceeding* two-thirds its value, that he was therefore bound in all cases to make it bring that *much*.

We think there was error in the Appellate Court of Virginia in holding the sale void because this was not done.

2. In the act of August 5th, 1861, apportioning the tax of $20,000,000 among the States, according to population, provision is made for its collection out of the lands within those States, if not paid by the States. Under the provisions of that act it might admit of some doubt whether the tax was in its essence a tax on the land, and on all the various estates into which the fee may have been divided, or was a tax on the owner of the land, and levied on the interest of the owner in it, and on no other subordinate or incorporeal interest. But no tax was ever collected, or any land sold under that act. The States which, in the war for the support of which this tax was levied, supported the General Gov

ernment, assumed and paid the portion allotted to each. With regard to the States which were in insurrection, Congress passed a new law for the assessment and collection of their portion, under which the sale in this case was made That act, the statute of 1862, to which we have already referred, directed the commissioners to whom the collection of the tax was intrusted, to take the last assessment of the value of the lands made in each State for State taxation as the basis on which the tax charged to that State by the act of 1861 should be apportioned among the several lots and parcels within that State, and a penalty of fifty per cent. was added in each case for non-payment. The President was directed to declare by his proclamation what States or parts of States were in insurrection, and "thereupon the said several lots or parcels of land became charged respectively with their respective portions of said direct tax, and the same, together with the penalty, became a lien thereon, without any further proceedings whatever." Section three gave a time in which this tax might be paid, and section four proceeds to say that "the title of, in, and to each and every parcel of land upon which said tax has not been paid as above provided, shall thereupon become forfeited to the United States, and upon the sale hereinafter provided for shall vest in the United States, or in the purchaser at such sale, in fee simple, free and discharged from *all liens,* incumbrances, right, title, and claim whatsoever."

There is nothing in the statute which requires the tax commissioners to hunt up the owner, or to make the tax out of personal property of his, or which may be found upon the land. It is clearly a direct tax on the land, and on all the estates, interests, and claims connected with or growing out of the land. All this was forfeited to the United States on non-payment of the taxes, and passed with the sale to the purchaser, subject alone to the right of redemption, which the law allowed. In that respect it was a defeasible title, but in all other respects perfect, complete, and entire. The language of the statute is explicit to this purport, and the policy and necessity of the government, which could not

look after the fugitive and hostile owners, required such a tax, and such a mode of collecting it. ·

We are of opinion, therefore, that the sale being a valid one the rent charge of the defendant in error was cut off and destroyed by it.

JUDGMENT REVERSED, and the cause remanded for further proceedings IN CONFORMITY TO THIS OPINION.