KEELY *v.* SANDERS.

1. The court reaffirms the doctrine in *De Treville* v. *Smalls* (98 U. S. 517), that the certificate given by the commissioners to the purchaser of lands at a sale for a direct tax, under the act of June 7, 1862 (12 Stat. 422), as amended by the act of Feb. 6, 1863 (id. 640), is *prima facie* evidence of the regularity of the sale and of all the antecedent facts essential to its validity and to that of his title thereunder, and that it can only be affected by establishing that the lands were not subject to the tax, or that it had been paid previously to the sale, or that they had been redeemed.

2. The sale may be valid, although, when it and the assessment were made, the lands belonged to a non-resident and were *in custodia legis*, the State court in which the *lis* was pending having enjoined all creditors from interfering with or selling them, and they were sold as an entirety, notwithstanding the fact that the tax bore but a small proportion to their value.

3. A description of the lands in the notice of sale, which identifies them so that the owner may have information of the claim thereon, is all that the law requires.

4. The word "district," where it occurs in the sixth section of the said act of 1862, signifies a part or portion of a State.  The city of Memphis, Tenn., where the lands in controversy are situate, was, therefore, a district within the meaning of that section.

ERROR to the Supreme Court of the State of Tennessee. The facts are stated in the opinion of the court.

*Mr. William M. Randolph* for the plaintiff in error. There was no opposing counsel.

MR. JUSTICE STRONG delivered the opinion of the court.

In the courts of the State this was a bill to quiet title to a parcel of ground in the city of Memphis, filed against the appellant, who claims to be the owner by virtue of a sale for direct taxes made June 24, 1864, and who holds a certificate of tax sale (No. 1054) given to him in accordance with the seventh section of the act of June 7, 1862 (12 Stat. 422), as amended by the act of Feb. 6, 1863. The force and effect of that certificate we have had occasion to consider in *De Treville* v. *Smalls,* 98 U. S. 517. By the act of Congress it is made *prima facie* evidence of the regularity and validity of the tax sale and of the title of the purchaser under it, and it is enacted that it shall only be affected as evidence of the regularity and validity of the sale by establishing the fact that the property was not subject to taxes, or that the taxes had been paid previously to the sale, or that the property had been redeemed according to the provisions of the act. The bill assails the title of the appellant, and charges that the sale made to him was null and void, for ten different reasons, which it assigns. Most of them are assertions of fact, denied in the answer and sustained by no proof. Among the charges is one that at the time of the tax sale the property was *in custodia legis,* and that under orders of the State court in which the *lis* was pending all creditors — individual, State, and Federal — were enjoined from selling or interfering with the same. This, of course, was susceptible of proof only by the record. But no such record was produced. All that was submitted was the parol testimony of a witness that the Chancery Court and the Supreme Court had both taken jurisdiction of the property, and ordered sales of the same, or parts thereof, to pay the debts of the decedent owner. Waiving, however, objection to this mode of proof, we do not perceive that the fact charged, if it was a fact, had any tendency to impair the validity of the tax sale. Such a sale did not disturb any possession which the State court had

of the property; and no State court could, by injunction or otherwise, prevent Federal officers from collecting Federal taxes. The government of the United States, within its sphere, is independent of State action; and certainly it would be a strange thing if a State court by its action could relieve property to Federal taxation from liability to pay the taxes when they are due.

Secondly, the bill charges that the property was misdescribed in the publication, orders of sale, and in the sale itself, and that no legal or proper notice of the sale was ever given by advertisement or otherwise. There is, however, no proof of any material misdescription. The lot was described as follows: "Market Street and Thornton Avenue part of country lot five hundred and six (506) two acres, assessed to Sanders and Perkins in 1860, fifth civil district, city of Memphis." That this was a true description, quite sufficient to identify the property, is not denied. Nor is it denied that it is the same as that made in the State assessment of 1860. But it is charged that though the property was part of lot 506, as described, the part sold was known as portions of lots 19 and 3, allotted to the heirs and devisees of Sanders. It was not, however, described in the State assessment by those numbers, and mentioning those numbers in the description made by the tax commissioners would have added nothing to its certainty. The purposes in describing lands to be sold at a tax sale, says Judge Cooley, in his Law of Taxation, p. 284, "are, *first*, that the owner may have information of the claim made upon him or his property; *second*, that the public, in case the tax is not paid, may be notified what land is to be offered for sale for the non-payment; and, *third*, that the purchaser may be enabled to obtain a sufficient conveyance." "If the description is sufficient for the first purpose, it will ordinarily be sufficient for the others also." There can be no doubt that the description in this case was all that was needed to identify the land, and to inform the Sanders heirs or devisees, who are the complainants in the bill, of the claim made upon their property.

As to the objection that the property was not advertised for sale legally and properly, it is sufficient to say that the act of Congress makes the commissioners' certificate of sale *prima*

*facie* evidence of the regularity and validity of the sale and of the title of the purchaser. Even if it is not conclusive of the existence of every thing antecedent necessary to such regularity and validity, except liability for taxes and their non-payment, it is affirmative evidence, controlling until rebutted. In this case, so far from there being any evidence to rebut the *prima facies* of the certificate, or any evidence to support the allegation of the bill, there is positive testimony that the property was advertised for sale in a newspaper then published in Memphis.

Thus far we have not considered the effect of the proviso to the seventh section of the act of 1863. That should not be overlooked. After having declared that the commissioners' certificate should be *prima facie* evidence both of the regularity and validity of the sale, as well as of the title of the purchaser, Congress went further, and enacted that it should be affected as evidence of such regularity, validity, and title only by establishing one or more of three facts : non-liability of the property for taxes, or that the taxes had been paid before the sale, or that the property had been redeemed. Of what possible use was this proviso, unless it was intended to make the certificate conclusive of the validity of the sale and the title of the purchaser, unless it should be impeached by establishing one of the three facts mentioned? If it meant only that proof of the existence of one of those facts should destroy the *prima facie* effect of the certificate, it was quite superfluous. Without it, if either of those facts existed, a sale would have been invalid, and the certificate good for nothing, no matter how regularly the sale might have been conducted, or how fully and correctly it might have been advertised, or how accurate might have been the assessment. Congress must have had a purpose in the proviso, and what that was it is not difficult to discover. It was not to repeat what had been enacted in the same section. The provisions of the whole act were designed to enforce the collection of direct taxes in insurrectionary districts, avowedly so. Governmental disturbance in such districts must have been anticipated, as well as only a partial restoration of the ordinary forms of governmental rule, while the districts were under military control, and consequent irregularities in the processes

of collecting taxes. Substance, therefore, not form, was to be required. Hence the proviso. It secured to land-owners every substantial defence against sales for taxes, and made the sale certificate conclusive of every thing else. Such was our opinion expressed in *De Treville* v. *Smalls*, and we adhere to it now.

The fourth and fifth objections to the validity of the sale are, that while the taxes due bore but a small proportion to the value of the property, the commissioners sold it as an entirety without subdivision. If this was so, it was a mere irregularity, and by no possibility could it affect the validity of the sale. But it was not even an irregularity. The seventh section of the act of 1863 required the commissioners to sell the "lot or parcel of land" upon which the tax was assessed, not such parts of it as on trial might prove sufficient to pay the tax. It was not made their duty to subdivide the property.

Another objection urged in the bill against the title acquired by the appellant at the commissioners' sale is in effect that the complainant resided in Texas; did not know of the sale until after it was made; that some other person who was interested could not get to Memphis in time to redeem before the commissioners had left; and that there was no safe communication by travel or otherwise outside the city to Nashville or elsewhere. All this is only asserted as hearsay, and there is no proof that there was ever any attempt to redeem, or any purpose to redeem. On the contrary, the proof is that one of the owners was in the city of Memphis before the commissioners left, and was told he could redeem the property if he wished; but he refused, expressing the opinion that "as soon as the courts got organized it would all be upset." But at best, the objection is wholly unimportant. The law charged the tax upon the land. The proceeding to collect it was a proceeding *in rem*, of all stages of which the owners had legal notice. It was their duty to pay the tax when it was due. The commissioners were not bound to hunt them up. *Turner* v. *Smith*, 14 Wall. 553. And it is not claimed that either the commissioners or the purchaser at the sale had any agency in preventing a redemption, or that there was any obstacle in the way thereof that could not easily have been overcome. While it may be admitted that a statutory right of redemption is to be favorably regarded, it is nev-

ertheless true that it is a statutory right exclusively, and can only be claimed in the cases and under the circumstances prescribed. Courts cannot extend the time, or make any exceptions not made in the statute. Redemption cannot be had in equity (*Mitchell* v. *Green*, 10 Metc. (Mass.) 101), except as it may be permitted by statute, and then only under such conditions as it may attach. *Craig* v. *Flanagan*, 21 Ark. 319. Thus it has been held that the pendency of the civil war, and the fact that the owner resided in another State then in rebellion, cannot enlarge his right to redeem. *Finley* v. *Brown*, 22 Iowa, 538. It is enough, however, for the present case that there was no attempt or even offer to redeem.

There are several other matters charged by the bill as objections to this sale unsustained by evidence, and immaterial.

One more only requires consideration. It is the averment that when the tax sale was made the military authority of the United States was not established in and over the county of Shelby, State of Tennessee, nor was it established in any one county, as required by law.

The sixth section of the act of June 7, 1862, to which the act of Feb. 6, 1863, was a supplement, enacted that the board of tax commissioners should " enter upon the discharge of the duties of their office whenever the commanding general of the forces of the United States, entering into an insurrectionary State or district, should have established the military authority throughout any parish or district or county of the same." Manifestly this was only directory to the commissioners. It was neither a grant nor a limitation of power. By previous sections the tax had been charged upon every parcel of land in the State, and the commissioners had been authorized to fix the amount and receive payment. The sixth section merely directed when their duties should commence.

Further than this, whether the military authority had been established throughout Shelby County before the commissioners entered upon the discharge of their duties, is a political question, to be answered by the executive branch of the government and not by the courts. In its nature it was incapable of being determined by the latter. Successive juries might give to it different and contradictory answers.

That before the commissioners undertook to enforce the collection of the tax upon the lot in controversy, it had been determined by the executive that military authority had been established in the district, is plain enough. We know, historically, that the President had appointed a military governor of the entire State, and he was in active service as such. No other and civil authority existed. The commissioners themselves were executive officers, and their entering upon the duties of their office was an assumption that the military authority had been established throughout the district. The act of Congress required no express and formal determination that it had been so established, and therefore, whether it had or not, may be inferred from any executive action that assumed it had. Hence, opening an office for the collection of the tax, and proceeding to enforce collection, raised a presumption of the legality of the commissioners' action. The law presumes that persons acting in a public office have been duly appointed, and are acting with authority, until the contrary is shown. And it has been said that if officers of corporations openly exercise a power which presupposes a delegated authority for the purpose, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. *Bank of United States* v. *Dandridge*, 12 Wheat. 64.

This is not all of the case in hand. Not only is the averment of the bill that the military authority of the United States was not established in the county of Shelby when the tax sale was made denied by the answer, but the averment is unsustained by proof. The city of Memphis, it is conceded, was in full and undisputed possession of the Federal army. All that is proved is that the military lines were around the city, at a distance of a mile or so from its corporate limits, and that the remaining part of the county was not in Federal occupation. All that is quite consistent with the fact that Federal military authority was established over the whole county. No conquering army occupies the entire territory conquered. Its authority is established when it occupies and holds securely the most important places, and when there is no opposing governmental authority within the territory. The inability of any other power to establish and maintain governmental authority therein is the test.

But if it should be conceded that Federal military authority had not been established throughout the entire county of Shelby, undeniably it had been over Memphis, where the sale was made and where the lot sold is situated. That city had territorial limits and a municipal organization, with taxing power and assessments distinct from the county of which it was a part. It was in a very proper sense a " district," and, we think, a district within the meaning of the acts of Congress. Those acts manifestly had in view not merely the larger civil divisions of a State or Territory, but " portions of a State," " sections of country," or " conquered territory." The title of the act of 1862 is, " An Act for the collection of direct taxes in insurrectionary districts within the United States, and for other purposes," and the first section enacted that " when in any State or Territory, or in *any portion* of any State or Territory, by reason of insurrection or rebellion, the civil authority of the government of the United States is obstructed," &c., . . . " the said direct taxes " . . . " shall be apportioned and charged in each State or Territory, *or part thereof*, wherein the civil authority is thus obstructed, upon all the lands and lots of ground situate therein," &c. The second section required the President to declare by proclamation in what States *or* " *parts of States* " the insurrection existed. These provisions make no reference to civil divisions of a State. And when we pass to the sixth section, it is observable that it speaks of an entry of a commanding general into " any *such* insurrectionary State or district." Here it is plain the word " district " means simply a " part " or " portion " of a State, such as has been previously mentioned. The section then proceeds to direct the commissioner to open offices when the military authority shall have been established throughout any county or parish or district of the same ; that is, throughout any district of an insurrectionary district or State. It seems almost an inevitable conclusion that " taxing districts " was meant, and not alone the large divisions, such as counties or Louisiana parishes. " Taxing districts " were in view, as appears also from the thirteenth section, which contemplated a reference by the commissioners to the records of assessments and valuations previously made ; and such districts for taxation had a well-known meaning when

Congress passed the law.   They are portions of a State's terri-
tory, described for the purpose of assessment, not necessarily
political subdivisions for any other purpose.   Our conclusion,
therefore, is that the city of Memphis was a district, within the
meaning of the sixth section of the act of 1862 ; and for the
various reasons we have given, we hold that the objection which
we are now considering to the validity of the appellant's title is
without foundation.   Upon this mainly, if not alone, the court
below appears to have rested its judgment.

The judgment of the Supreme Court of Tennessee will be
reversed, and the record remitted with instructions to direct a
dismissal of the bill ; and it is

*So ordered*

MR. JUSTICE FIELD dissented.