195 So. 260

## CLARK v. STATE.
### 8 Div. 946.

Supreme Court of Alabama.
April 4, 1940.

[1] 238 Ala. 606.

G. W. Chamlee, of Chattanooga, Tenn., for appellant.

Thos. S. Lawson, Atty. Gen., and Wm. H. Loeb, Asst. Atty. Gen., for the State.

KNIGHT, Justice.

The appellant, William Clark, was indicted by a Grand Jury of Limestone County, impaneled at the fall term of the circuit court of said county, for the offense of rape.

The judgment entry shows that on November 3, 1938, the defendant was arraigned upon said indictment, he being then personally present in open court and attended by his attorneys, and upon said arraignment pleaded "not guilty." This plea of "not guilty" was duly entered upon the minutes of the court in said cause. The case was then set for trial on November 10, 1938, and on that day, November 10, 1938, the defendant was put on trial, and was convicted by the trial jury of rape, as

charged in the indictment, and his punishment fixed by the jury at death.

The record proper shows due organization of the court, indictment in due form of law, and proper arraignment of the defendant upon the indictment and his plea of not guilty thereto; proper order setting the case for trial on November 10, 1938, and a proper order for a special venire to be composed of 75 qualified jurors to try the case. With reference to all these matters the law was fully complied with, as appears from the judgment entry. No errors appear upon the record proper.

Section 5407 of the Code of Alabama provides: "Any person who is guilty of the crime of rape must, on conviction, be punished, at the discretion of the jury, by death or imprisonment in the penitentiary for not less than ten years."

The crime being one that the jury might, in its discretion, punish by death, it becomes the duty of the court to appoint attorneys to defend the accused, he not being able to employ counsel. This duty the court observed in this case.

It appears from the record that the court appointed by name attorneys of the highest standing at the bar of Limestone County to appear for and represent the defendant in said case, and the record shows that the attorneys so appointed represented the defendant throughout the trial.

It appears from the record that on November 3, 1938, defendant's attorneys filed a motion, duly sworn to by the defendant, that the cause "be transferred to the Juvenile Court to be there dealt with according to law and for grounds of said motion says as follows: 1. The defendant is charged with rape, and the defendant is only 16 years of age, he having been born on the 24th day of September, 1922." On motion, the court made and entered the following order. "The defendant files motion in writing showing defendant to be a minor over 16 and under 18 years of age, praying for an order transferring the case to the Juvenile Court; the court does not deem it to be in the interest of justice and of the public welfare to transfer the case to the Juvenile Court, and the same being considered by the court, it is ordered and adjudged by the court that the said motion is overruled." In this there was no error. General Acts of Legislature 1923, p. 296.

In view of the insistence of defendant's present counsel, who came into the case after the conviction and sentence of the defendant, that the evidence was insufficient upon which to convict the defendant of rape, we deem it not amiss to set out, rather at length, the substance of the state's evidence, *and all of the defendant's evidence.*

The first witness called and examined by the state was Leacie Clem, the woman alleged to have been raped, and she testified in substance: That she knew the defendant, William Clark, that for about two years he lived on her father-in-law's place, and that she saw him frequently, and knew him when she saw him; that on the day the occurrence took place she had been down to her father-in-law's house; that when she returned to her house, "about a quarter of nine, she went into the kitchen, and then on through the house, and came back to the bathroom; that after being in the bathroom about a minute she noticed the door was pulled out more than usual," and that she pulled the door farther out, and saw the defendant behind the door. That she saw it was a colored man, but did not know who it was at that time; that she screamed and ran towards her bedroom, and the defendant ran after her and caught her on the back and threw her down, choking her. That she struggled a few minutes, and he threw her down on the floor, and that she asked him not to kill her, but he kept choking her, and she became unconscious. That when she regained consciousness, the defendant was on top of her; that he had torn her clothes off and was in the act of raping her; that he did this while she was unconscious, and when she "came to" he was in the act of having intercourse with her; that she screamed and tried to get away, and he started to choking her again, and that she told him to take anything in the house that he wanted but "just not to kill me," and "that is when he *drug* me by the hair of the head and I was close to the dresser and he pulled me up to the dresser and put nose drops and powder in my eyes took his fingers and rubbed it in my eyes and left me and locked both doors to the room I was in, and when I woke up from my unconsciousness I knew that his privates had penetrated my privates." That she recognized defendant before she became unconscious. She further testified: That when "she came to herself" she was trying to get her eyes open so she could see, that she then ran out of the house to the home of Mrs. Norton, and gave the alarm.

That the defendant took her husband's overcoat and leather jacket and the watch she had on at the trial, and he also took a fountain pen. She further testified that the defendant made scars on her neck, her legs, on both knees, elbows and on her head, and that the scars were still there. She further testified that she got the watch back from the officers.

The arresting officer, Johnson, testified that he got the watch which Mrs. Clem testified the defendant had taken from her, from the defendant, and after predicate had been laid, this witness testified that the defendant told him he had not planned the crime, that the reason he did it, he "reckoned the devil crossed his mind."

John Clem, a witness for the state, testified that he went to the house of Mrs. Clem within a few minutes after the alarm was given, and he found "the torn clothes on the floor of the bedroom where this trouble occurred."

There was other testimony on the part of the state, tending to show the commission of the offense charged, and also tending to connect the defendant with the crime.

The only testimony offered on behalf of the defendant was his own evidence, and we will here set it out.

"My name is William Clark, and I lived with my mother Hester Clark on Charley Anderson's place, and I was sixteen years old on the 24th day of September, 1938, and I know where Mr. Gene Clem lives, and also know Mrs. Lecie Clem. I went to their home and got there between 8 and 9 o'clock, having left my sister's about five miles away and I was looking for money and I went in the house through the front door, and went on to a chest and went to looking in there for money. I went into the living room and when I left there I come on into the bathroom. There was nobody there that I know of and I did not see or hear anybody when I entered the home, but after I got there Mrs. Lecie Clem came in, and I saw her when she was coming and she came through the back door, and I was behind the door in the bathroom, I went in there when I heard her coming and I have just heard what Mrs. Clem said. I did not rape or ravish Mrs. Clem.

"On cross examination by the State, the witness testified as follows:

"I was in the house when I seen her coming, and I had gone in there to steal money and she came in the back door, and I was in her living room near the front door and she was coming in the back door and instead of going out the door I went to the bathroom and hid behind the door in the bathroom, and when she came in and saw me she ran and screamed and I followed her and caught her before she got to the bedroom and choked her from the back.

"Q. What hand did you use? A. Used this one.

"Q. What did you do with the other hand? A. I just had her around the waist with this other one.

"Q. Hold that hand up so the jury can see, the one that you choked her with. You choked her until she fell? A. Yes, sir. And she become unconscious and when she fell I turned her loose, and I did not put powder in her eyes, it was bacca crumbs, I did not put snuff in her eyes, just put tobacco crumbs, and this was after I had choked her, and I did not take her underclothes off of her, and did not leave them on the floor, but I did choke her and when she fell I throwed bacco crubs in her eyes and I locked the door and come on back and got her watch and rifled the house. I got her clothes and when the officers arrested me the clothes were at this other fellow's house. I had the razor at the time I was choking her, but the razor was my father's. I had the razor when she fell on the floor, but I did not get down there with her. I didn't choke her until I thought she was dead, but I did put tobacco crumbs in her eyes, and when she got out she jumped out of the window and got away, and I peeped in there but did not see those underclothes on the floor and when she fell at the time I choked her, I did not fall.

"Recross:

"You testified in the trial of this case a few weeks ago and in that trial did you not testify while in the struggle while you were choking her did you not fall down when she fell, and you answered 'Yes, sir'. Didn't they also ask you this question: Q. Now, after you all fell down in the floor, you said you fell down with her, didn't you. The witness answered, 'No, sir.'

"Redirect examination of Deft.:

"When I looked in the room and saw that Mrs. Clem had gone I came back in the front bedroom and I got that watch and the clothes were in a closet right there in the bedroom and I left and come to Bob Leopard's house where Joe Rainey lives about three or four miles away, and I was

arrested about ten-thirty, or eleven o'clock and we got to town before twelve o'clock.

"Recross examination:

"Here the State asked the following question: Now, didn't you testify in this case before when you were tried a few weeks ago? Witness answered: Yes, sir. Question: And didn't you testify then on that trial, when questioned by your lawyer, this: 'Well, now, in the struggle, while you were choking her, did you fall down when she fell?' And didn't you answer, 'Yes, sir?' The defendant answered, 'No, sir.' When I first got to the Clem house that morning I went into the living room, I didn't hear anything and stayed in there about five minutes and I just went over there to that house looking for money, and when I got to the house I went in through the front door without knocking, and got these things that I have mentioned."

At the conclusion of the evidence, the court gave the jury a very full and comprehensive charge, going over every phase of the law applicable to the case, and also fully instructing the jury as to the burden and measure of proof required before a conviction of the defendant could be had as to any charge embraced in the indictment.

Notwithstanding the fact that the court's oral charge was full, and extremely fair to the defendant, his counsel requested, in writing, thirty-eight special charges. Of this number the court gave thirty-five, refusing only three.

■ The evidence in the case was not only sufficient to carry the case to the jury on the charge of *rape,* but was sufficient to support the verdict of the jury finding the defendant guilty of rape. The punishment, of course, was a matter entirely within the discretion of the jury. The court, therefore, committed no error in refusing the general charge requested in writing by the defendant.

Charges 9 and 19 requested in writing by the defendant were fully covered by the court in its oral charge, and besides the charges were bad in the use of the word "supposition". Smith v. State, 197 Ala. 193, 72 So. 316.

Following the defendant's conviction and sentence thereon, the defendant filed a motion for new trial. This motion was filed for the defendant by counsel employed after his first trial on November the 3, 1938, but who did not appear in the cause, as counsel for the defendant until after his second trial, which resulted in the conviction. On the first trial on November 3, 1938, the jury failed to agree and a mistrial was entered.

In this motion for new trial, many grounds are stated why the verdict of the jury should be set aside and a new trial granted the defendant.

What has been heretofore stated with reference to the evidence will serve to show that, in our opinion, there was absolutely no merit in the first ground stated in the motion for the new trial.

It is also urged for the first time in the motion for new trial, that the public mind in Limestone County was so inflamed against the defendant that it was utterly impossible for him to have received a fair and impartial trial. No motion was made in the cause for a change of venue, nor does the evidence in the record show that there existed at the time of the trial on November 10, 1938, such hostility and prejudice against the defendant as would make it impossible, or even probable, that he could not secure a fair and impartial trial before a jury impaneled of qualified citizens of Limestone County. Counsel for the defendant, whom the evidence shows were highly esteemed members of the Limestone County Bar, must not have been impressed that the situation and conditions then prevailing and surrounding the defendant were such as to render improbable or impossible a fair and impartial trial for the defendant, or, we feel sure, a motion for a change of venue would have been made. Counsel owed the defendant no duty to file such a motion in the absence of some circumstance, or circumstances, which would indicate to reasonably active and alert counsel that their client could not secure a fair and impartial trial at the hands of a Limestone County jury. It cannot be assumed that because one is charged with rape, and that there may have been expressions of hostility or resentment from some sixty to one hundred and fifty persons at the time when the alleged rape was committed, that the accused cannot get a fair and impartial trial in the county where the alleged offense was committed. Often such exhibitions are under temporary excitement, which soon pass by.

It is also insisted for the first time on motion for new trial that the indictment should be quashed for the reason that qualified persons of the negro race had been arbitrarily and systematically excluded

from the jury box and jury rolls of Limestone County for fifty years solely because of their color and race.

■■ It is insisted that the mother of the defendant, after the first trial, secured counsel to prepare a plea in abatement to quash the indictment on the above stated grounds, but that counsel for defendant, through fear for their personal safety, or for other reasons personal to themselves, did not file the plea. No doubt counsel would have filed the plea, if there had been evidence sufficient to justify such action. We are not authorized to ascribe to the action of counsel motives of such character. Counsel must be allowed some discretion in the conduct of their client's case. Procedural law of this state required that pleas in abatement must be filed before pleading to the merits, or in bar, and if not so filed, it is discretionary with the court whether he will allow the withdrawal of the plea of not guilty to permit the filing of a plea in abatement. Hubbard v. State, 72 Ala. 164; Jackson v. State, 74 Ala. 26.

No plea in abatement was filed in the cause, and the matters which should have been presented by a timely plea, if there had been evidence to support it, were attempted to be raised for the first time on motion for new trial.

■ But without regard to the tardiness in presenting the question of the exclusion of qualified persons of the negro race from the jury box and jury rolls by proper plea in abatement, or motion to quash, we may say that the evidence offered in support of this contention by the defendant fails to show that the officers charged by law with the duty of filling the jury box, and preparing the jury rolls of Limestone County, systematically or arbitrarily excluded from the jury box or jury rolls persons of the negro race solely because of their color or race. The evidence shows that there were, and had been names of persons of the negro race, qualified for jury service, in the jury box, and some had been drawn for jury service at different times, but had been excused from serving, presumably at their request.

We are of the opinion, and so hold, that the defendant-appellant wholly failed to show that qualified citizens of the negro race had been arbitrarily excluded from the jury box, and jury rolls of Limestone County on account of their race or color. Nor are we impressed by the evidence that the defendant was not adequately represented by appointed counsel.

The argument submitted to show that the defendant was not afforded adequate representation for the reason that no argument was made to the jury, in answer to the first and only argument made by the solicitor, is, in our judgment, without force. No doubt counsel for defendant were of the opinion it was the part of wisdom not to reply to the opening argument of the solicitor, for thereby they would prevent him from making a final and concluding argument. After the solicitor had concluded his opening argument, it appears from the record, the attorneys requested more than thirty special charges in writing, all of which were given by the court, except three. No doubt counsel were of the opinion that this procedure was better than to give the solicitor opportunity to make the final and concluding argument in the case. This practice is often resorted to by the best and wisest attorneys. There is no merit in this contention of the defendant.

This court is fully mindful of the fact that the systematic exclusion of negroes on account of their race and color from the jury box and jury rolls, on proper and timely motion and showing, requires the quashing of an indictment returned by a grand jury drawn from such a box, yet a careful reading of the evidence submitted on the motion for new trial (if it be conceded that the question could be raised for the first time on such motion for new trial) fails to show that the jury commission of Limestone County was guilty of such illegal practice; on the contrary, the evidence shows that there had been no such exclusion of negroes from the jury box or jury rolls.

■ It must be conceded that the qualification of jurors is to some large extent left to the sound discretion of the jury commission, but, of course, the jury commission, while exercising this discretion, cannot exclude persons of the negro race because of their race, if they possess the required qualifications. Collins v. State, 234 Ala. 197, 174 So. 296.

The issues presented on the trial and the facts of the case differentiate it from the case of Hugh Pierre v. State of Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757.

The record in this case has been carefully read and considered, and we fail to find any errors, or that any constitutional

rights of the defendant were denied him, and it results that the judgment of the circuit court must·be affirmed.

And it appearing to the court that the day heretofore fixed by the Circuit Court of Limestone County, Alabama, for the execution of the appellant has passed pending this appeal, it is ordered by the Court that Friday, the 31st day of May, 1940, be and it is hereby fixed and set for the execution of the appellant in all respects as required by law.

Affirmed, and Friday, 31st day of May, 1940, set for the execution of appellant.

All the Justices concur.