115 So.2d 110

### Albert F. FULLER

v.

### STATE.

### 4 Div. 285.

Court of Appeals of Alabama.

April 22, 1958.

Rehearing Denied May 13, 1958.

298

John Patterson, Atty. Gen., and Edmon L. Rinehart, Asst. Atty. Gen., for the State.

Jos. W. Smith, Smith & Smith and J. Pelham Ferrell, Phenix City, for appellant.

CATES, Judge.

Fuller is here on appeal from a judgment of conviction in the Russell Circuit Court on an indictment charging him with accepting a bribe to permit the operation of a house of prostitution known as Cliff's Fish Camp. The trial judge sentenced him to seven years' imprisonment in the penitentiary. The facts produced by the State tended to show that Ralph Mathews was the Sheriff of Russell County for a term beginning January, 1951, and that Fuller was his chief deputy.

The testimony of a number of the girls who described themselves as entertainers at Cliff's Fish Camp ran in a similar pattern to the effect that Cliff Entrekin, the entrepreneur of the establishment, took out ten per cent of the girls' share of the earnings, and he, in turn, every Monday would pay Fuller an amount equal to roughly one-third of the total revenue involved from prostitution.

One of the girls testified that she went with Entrekin and carried an envelope with some $600, which was dropped in the mail box at Fuller's garage apartment (owned by Sheriff Mathews) near the hospital in Phenix City. The same witness also testified that she saw Fuller receive an envelope with money placed in it by Entrekin about ten times on various visits by Fuller to the Fish Camp.

To show that Fuller was aware of the activities, there was testimony by one prostitute tending to show that on one occasion at the county jail Fuller indicated that the girls had nothing to worry about in the way of raids on the establishment. There was further testimony of Fuller leading raids, but all of the prostitutes would take to the woods, so that the party would report to the high sheriff that they could find no illegal activities.

Fuller took the stand in his own defense and was asked if he had ever on any occasion received any money from Cliff Entrekin, coupled with an agreement not to enforce the law. His answer was, "no sir, not one cent." The only other testimony for the defense was that of the sheriff who testified to the fact that Fuller's apartment had no mail box, for the reason that Mr. and Mrs. Fuller used the mail box of the Mathews.

Both the defendant and the State in briefs have treated mainly questions going

to the circumstances surrounding the indictment, the sending of Hon. Walter B. Jones of the Fifteenth Judicial Circuit to act as a circuit judge for the Circuit Court of Russell County, the purging (at his instigation) of the jury rolls of Russell County, and a proclamation of the then Governor. This proclamation reads as follows:

"Whereas, organized crime has for many years existed in Russell County, Alabama, particularly in Phenix City; and

"Whereas, a gang of men have conspired and are conspiring to thrive on the systematic exploitation of vice; and

"Whereas, the organized lawless activities of this gang continue to hamper the investigation of the murder and the ferreting out of the murderer of Albert Patterson and other crimes; and

"Whereas, there exists in said community a serious emergency, a defiance of the Constitution and laws of Alabama, a state of lawlessness, breach of the peace, organized intimidation and fear, and there is continued and imminent danger thereof, which the local peace officers are unable or unwilling to subdue:

"Now, Therefore, I, Gordon Persons, as Governor of Alabama and Commander in Chief of the Alabama National Guard, do hereby proclaim a state of qualified martial rule in Russell County, Alabama.

"I further instruct the Adjutant General of Alabama, now actively on duty with units of the Alabama National Guard in Russell County, to take over, assume, supersede and exercise all the activities of the Sheriff of Russell County, Alabama, the deputy sheriffs of said county, constables, Chief of police of Phenix City, Alabama, and all police officers of said city, and until further order from me to take and continue to take appropriate measures to suppress the state of lawlessness, intimidation, tumult and fear which reigns in said area.

"In Witness Whereof, I have hereunto set my hand and have caused the Great Seal of the State of Alabama to be affixed by the Secretary of State, at the Capitol in the City of Montgomery, on this the 22nd day of July, 1954.

"/s/ Gordon Persons
Governor of Alabama and Commander in Chief of The Alabama National Guard.

"Attest:
/s/ Mrs. Agnes Baggett
Secretary of State."

The defects of the Chief Justice sending Judge Jones and the proclamation of "qualified military rule" by Governor Persons were sought to be reserved for our consideration by virtue of a document which appears in the record immediately after the qualification of the array of jurors for the week of the trial. This document was entitled "Defendant's Objections to Being Put to Trial."

■ It is a familiar rule that the substance of the plea (and, of course, the motion) is the clue to its character and not necessarily the wording of its caption and the like (Code 1940, T. 15, § 282). This instrument stated that the defendant objects to being placed on trial "at this time and in this presence," and assigned thereto are some 112 grounds as supporting the objection, separately and severally.

■ As to authority of the Chief Justice of Alabama, he is more than a mere judge; he is the chief officer of the Judicial Department and has a commission which requires him to see that the business of all the courts is done promptly, and that cases are not permitted to become congested and delayed, and, in addition, he has the hu-

mane office of "Commissioner of Gaol Delivery," IV Blackstone Commentaries 270. Code 1940, T. 13, § 38, reads:

"The chief justice shall see that the business of the several courts of the counties is attended to with proper dispatch, and that the cases, civil and criminal, are not permitted to become congested or delayed, and he shall take care that prisoners are not allowed to remain in the jails without a prompt trial."

He has also the express power, "Whenever the public good requires more judges than are regularly provided by law for the holding" of court, to send one or more judges from another circuit. § 42, Ibid.

This record shows that the Russell Circuit Court was faced with a large number of indictments rendered at the special term of the grand jury at which Fuller was indicted.

Thus, we conclude that there was no error in the sending of the Hon. Walter B. Jones to act as a circuit judge in Russell County.

■ If we be mistaken in this, certainly we feel the defendant has not properly raised this alleged ultra vires act of the Chief Justice in a proper manner, in that, if he had been without jurisdiction, the writ of prohibition would have been the appropriate remedy to test his objection to the advent of Judge Jones.

■ The defendant failed to offer proof with respect to the allegations contained in his "objections"; and, accordingly, we consider ourselves precluded from going into the power of the Governor, particularly under Section 27 of the Constitution, to supersede the sheriff and other law enforcement officers of the county. Wharton, Criminal Law and Procedure, § 1849, states what we conceive to be the correct principle as follows:

"Any motion or plea, * * * which is based on allegations of facts not appearing on the record must, when controverted by the prosecution, be supported by evidence on the part of the defendant * * *."

Mr. Justice Stakely, in Reeves v. State, 264 Ala. 476, 88 So.2d 561, 564, wrote:

"In Alabama there are certain statutory regulations with reference to objections to an indictment. In §§ 278, 279 and 286, Title 15, Code of 1940, there are provisions setting forth the method of attacking an indictment. Section 278 provides that the proper method is by plea in abatement. Section 279 provides that in all cases such a plea in abatement must be filed before the plea to the merits. The same is true in section 286. In Clark v. State, 239 Ala. 380, 195 So. 260, it is shown that under the procedural law of this state pleas in abatement must be filed before pleading to the merits or in bar and it is only where the court in its discretion allows pleas to the merits to be withdrawn that pleas in abatement can be filed. The principle here referred to was recently dealt with by the Supreme Court of the United States in Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83. * * *"

Nor do we find anything in Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302, which makes our indigenous procedure, which has some common law warrant, a violation of due process, certainly in the historical sense.

Fuller was indicted October 8, 1954, and was not brought to trial until November 15. He was not shut off from an adequate time to take action against the indictment or the formation of the grand jury before his plea of not guilty. Thus, we do not have the choking off of an opportunity to raise substantial issues as was condemned in Reece v. State of Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77: rather, we have an instance of ample opportunity—more so

than the possible mere three days' minimum approved by the majority in Michel v. State of Louisiana, 350 U.S. 91, 76 S.Ct. 158, 100 L.Ed. 83, a capital case.

We scrupulously refrain from approving or disapproving the proclamation of Governor Persons of his so-called qualified martial rule.

It is to be pointed out at the outset of this enquiry that the record before us shows that the indictment was filed in·open court on the 8th day of October, 1954. The record is silent as to the removal of Sheriff Mathews from office, except that a certificate appears in the record showing that the circuit clerk served Mathews on the 21st day of July, 1954, which was the date of the organization of a special grand jury which handed down the instant indictment. There is in the record a minute entry under date of August 9, 1954, showing that there were present and serving in the court, in addition to Judge Jones, the Acting Attorney General and the Special Solicitor, two military officers of the Alabama National Guard, Lt. Col. J. A. Warren and Capt. Elwood Rutledge. The record also shows that Judge Jones called two Highway Patrolmen to serve as bailiffs for the grand jury. Under the clerk's attestation of October 27, there appears a return to a writ of venire for some sixty odd jurors over the signature of Lamar Murphy, who became the successor sheriff to Mathews.

The record itself is otherwise silent as to the conduct of the proceedings of the grand jury, particularly as to whether or not the summoning of the grand jurors was effected by militiamen.

The Attorney General would support the Governor's proclamation of qualified martial rule by reference to Section 131 of the Constitution, and Code 1940, T. 35, § 159. In addition, he cites as authority from other jurisdictions Moyer v. Peabody, 212 U. S. 78, 29 S.Ct. 235, 237, 53 L.Ed. 410, wherein Mr. Justice Holmes held good the declaration of the Governor of Colorado of a state of insurrection when "trouble was apprehended with the members of" the Western Federation of Miners, under a statute relating to invasion or insurrection. In the course of the opinion, we find:

"* * * When it comes to a decision by the head of the state upon a matter involving its life, the ordinary rights of individuals must yield to what he deems the necessities of the moment. Public danger warrants the substitution of executive process for judicial process. See Keely v. Sanders, 99 U.S. 441, 446, 25 L.Ed. 327, 328. This was admitted with regard to killing men in the actual clash of arms; and we think it obvious, although it was disputed, that the same is true of temporary detention to prevent apprehended harm. As no one would deny that there was immunity for ordering a company to fire upon a mob in insurrection, and that a state law authorizing the governor to deprive citizens of life under such circumstances was consistent with the 14th Amendment, we are of opinion that the same is true of a law authorizing by implication. what was done in this case. * * *"

We are lead into the Pennsylvania case of Commonwealth ex rel. Wadsworth v. Shortall, 206 Pa. 165, 55 A. 952, 955, 65 L.R.A. 193, which arose out of an anthracite strike in 1902. A militiaman who had shot a civilian who refused to obey his challenge was held by the civilian authorities for homicide. The Pennsylvania court liberated the soldier on the theory that the jurisdiction of the civilian courts had, in effect, been superseded by virtue of the proclamation of the Governor. Therein the court based its action upon what is, when reduced in the final analysis, the proposition stated by some authorities that martial law is no law, i. e., it is an establishment of force rather than one amenable to the judicial process. The Pennsylvania court summarized its views:

"The effect of martial law, therefore, is to put into operation the powers and methods vested in the commanding officer by military law. So far as his powers for the preservation of order and security of life and property are concerned, there is no limit but the necessities and exigency of the situation. And in this respect there is no difference between a public war and domestic insurrection. What has been called the paramount law of self-defense, common to all countries, has established the rule that whatever force is necessary is also lawful."

On the other hand, it has been stated, and the questions raised by Fuller's objections above mentioned are premised upon the view that the Constitution of Alabama, § 27, which provides in part, "the military shall, in all cases, and at all times, be in strict subordination to the civil powers," coupled with the statutory adaptation of the old English riot act found in Code 1940, T. 35, § 161 et seq., never contemplated that a military commander should ever serve as a civilian magistrate, i. e., the sheriff.

■ The sheriff, of course, is the highest purely executive officer of the county. State ex rel. Attorney General v. Pratt, 192 Ala. 118, 68 So. 255. A manifestly substantial unbroken line of history, from the time of Alfred the Great, shows that he has always been considered to be a civilian officer, the commander of the posse comitatus, and that, while the posse comitatus might in time of invasion or insurrection become the backbone of the militia, nevertheless the militia was, in such circumstances, purely an instrument of self defense having nothing to do with the bringing to trial or punishment of persons who violated the "municipal" law. Thus, it has never been considered that an enemy soldier, by the mere act of waging war, is a criminal.

It is further argued that this view finds support in Ex parte Milligan, 4 Wall. 2, 71 U.S. 2, 18 L.Ed. 281, where the majority opinion said, "Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction." And the argument of the Pennsylvania court is answered somewhat by the opinion of Mr. Justice Somerville in Betty v. State, 188 Ala. 211, 66 So. 457, 458, wherein it is said:

"But, it is plausibly urged, the necessities of the military service demand unquestioning obedience on the part of a subordinate to the orders of his commander; * * * And, it is further insisted, the Governor, as commander in chief, having determined that the particular act or action is under the circumstances appropriate or necessary in the military service, his judgment to that effect is conclusive and binding on soldier and civilian alike.

"* * * the general scope and the particular occasions of military service by the militia are fixed by law; and, although in the achievement of these authorized objects the Governor exercises the plenary powers of a commander in chief, we think it must be readily apparent that he cannot, by the mere device of a military order, create new forms and enter new fields of military activity. Such a power, capable of almost infinite abuse, would be incompatible with the spirit of our institutions. Not being expressly conferred by law, the power must be held as denied by necessary implication.

* * * * * *
"* * * A militia man is not an automaton, and the duty to obey a superior officer is bounded by the jurisdiction and authority of the officer who commands him."

Moyer v. Peabody, supra, was restricted by the court in Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 196, 77 L.Ed. 375, wherein Chief Justice Hughes said:

"It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary is well established. What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions. * * *"

We refrain, however, from going any further into this thesis and antithesis lest we might come up with a synthesis wherein we could be accused of tormenting the appellant by way of denying him a right because he is now without a remedy. The cruelty of such all too frequent judicial writing brings to mind the lament of Mac-Beth when he said:

"And be these juggling fiends no more believ'd.
 That palter with us in a double sense;
 That keep the word of promise to our ear,
 And break it to our hope!"

We have come to the conclusion that Fuller did not avail himself of his appropriate remedies to raise any questions as to the military taint on the composition of the court for two reasons: First, because under our view he should have sought a writ of prohibition to determine the jurisdiction of the court under the alleged circumstances. This procedure would have allowed him to have developed the facts in an independent proceeding separate and apart from the trial and before a different judge. We have found no precise citation involving the composition of the court under the circumstances here *alleged*, though the petition for habeas corpus appealed in the case of Clifford and O'Sullivan, 1921, 2 A.C. 570, involves a consideration of the writ of pro-

hibition which was sought to be obtained from an Irish court against a committee of officers appointed by a military commander during a proclamation of a state of armed insurrection in part of Ireland. There the writ of prohibition was held to be an improper remedy by reason of the fact that the committee of officers, if a military court, was nevertheless not such a court as would be amenable to a writ of prohibition.

In the Confederate conscription cases, Chief Justice Walker, while conceding that purely military matters were not reviewable by the civil courts, at least thought the civil courts could investigate:

"The cases of Ex parte Burnett, 30 Ala. 461, and Ex parte Smith, 23 Ala. 94, are deemed conclusive authority in favor of the right to apply to this court for a prohibition, without a previous application to an inferior court. The probate judge, in granting the habeas corpus upon the petitions, exercised an authority that did not belong to him; and there is no other remedy than the writ of prohibition. It is clear, therefore, that that writ is the proper remedy. Ex parte Smith, 23 Ala. 94; Ex parte Walker, 25 Ala. 81; Ex parte Greene & Graham, 29 Ala. 52. The petitioner for the prohibition is the party whose custody of the conscript is interfered with, and we think he may make this application.

"If we have the facts of these cases correctly presented to us in the petitions, the foregoing opinion is decisive of them. But, as the facts do not appear of record, we deem it the safer course to issue a rule nisi to the probate judge. 3 Blacks.Com. 113–14." Ex parte Hill, 38 Ala. 429, at page 443.

Here we have on the record before us a circuit judge of unquestionable authority, commissioned as a civilian judicial officer of the State of Alabama convening a special grand jury and presiding over what is essentially a civilian trial.

If the intrusion of naked military force into the processes of the Circuit Court of Russell County was such as to destroy or corrupt the civilian influence in the court so as to make Judge Jones a mere puppet of the military commander, we feel nevertheless that prohibition was the means to determine this rather than by the somewhat unique document filed here.

Secondly, if we be wrong in our views as to prohibition being the proper remedy, then we consider that the defendant nevertheless failed to exercise the further step (under his own mode of procedure) of bringing any evidence to support his allegations.

 At the outset of the trial, Fuller was brought into the court room on a stretcher and prayed the judge that his case be continued. In support of this motion which was made before the selection of the jury and apparently out of the presence of the venire, the defense adduced the testimony of Dr. J. A. Elkin, an orthopedic surgeon, to the effect that on July 4, 1954, Fuller sustained a back injury which required him to be hospitalized between three or four weeks. On cross-examination the doctor stated that he did not believe that the defendant's life would be endangered by being brought into court for trial, and that Fuller was not, at the time of this testimony, completely bedridden. Altogether we think the testimony with respect to the motion for a continuance presented a matter within the sound discretion of the trial judge. Accordingly, we find no abuse of the trial judge's discretion in this matter.

 A further question is raised that the prostitutes who gave evidence against Fuller were his accomplices. Therefore, their testimony, together with that of one Tony Viggins, who apparently was the bouncer at Cliff's Camp, required corroboration under our statute. Code 1940, T. 15, § 307. We do not subscribe to this view, for the reason that we distinguish, as does our statute, between the giving of a bribe and the taking of a bribe, cf. Code 1940, T. 14, §§ 63 and 64.

Thus, in the Teapot Dome and related scandals, it is a matter of history that the Secretary of the Interior, Albert Bacon Fall, was convicted of receiving a bribe, and yet the man shown by the evidence in his case to have given the $100,000 was acquitted (with Fall) in other proceedings of conspiracy to defraud the United States, Fall v. United States, 60 App.D.C. 124, 49 F.2d 506.

This rule which, at first blush, seems specious and partaking of medieval scholasticism, has the support of experience behind it, in that it is well known that many bribes are given under circumstances which may not amount to legal justification, but certainly call for mitigation. Thus, the inmates of Cliff's Fish Camp here certainly could hardly be said to have had much choice as to whether or not the taking of ten per cent of their unlawful earnings withheld by Entrekin as part of the premium for protection from Fuller was by any means voluntary.

It is claimed that because the measure of Fuller's exactions were predicated upon the earnings from prostitution, this would, therefore, make Fuller a partner. This reasoning partakes of the same fallacy as that of claiming an insurance company which charges workmen's compensation premiums based on a percentage of the payroll is thereby made a partner of the employer.

There is nothing in the record to show that Fuller agreed to foot any losses.

We have carefully reviewed this entire record of almost 200 pages, including the errors assigned, as required by statute, Code 1940, Tit. 15, § 389, and are at the result that the judgment of the court below is due to be affirmed.

Affirmed.